## GILLIGAN, GOVERNOR OF OHIO, ET AL. *v.* MORGAN ET AL.

No. 71–1553.   Argued March 19, 1973—Decided June 21, 1973

2

Burger, C. J., delivered the opinion of the Court, in which White, Blackmun, Powell, and Rehnquist, JJ., joined. Blackmun, J., filed a concurring opinion, in which Powell, J., joined, *post*, p. 12. Douglas, Brennan, Stewart, and Marshall, JJ., filed a dissenting statement, *post*, p. 12.

*Thomas V. Martin,* Assistant Attorney General of Ohio, argued the cause for petitioners. With him on the briefs was *William J. Brown,* Attorney General.

*Michael E. Geltner* argued the cause for respondents. With him on the briefs were *Leonard J. Schwartz, Melvin L. Wulf, Sanford Jay Rosen,* and *Joel M. Gora.*

*Solicitor General Griswold* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Assistant Attorney General Wood, Robert E. Kopp, Robert W. Berry,* and *R. Kenly Webster.*\*

---

\*Briefs of *amici curiae* urging affirmance were filed by *David E. Engdahl* for the Law Revision Center, and by *Jack Greenberg,*

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

Respondents, alleging that they were full-time students and officers in the student government at Kent State University in Ohio, filed this action [1] in the District Court on behalf of themselves and all other students on October 15, 1970. The essence of the complaint is that, during a period of civil disorder on and around the University campus in May 1970, the National Guard, called by the Governor of Ohio to preserve civil order and protect public property, violated students' rights of speech and assembly and caused injury to a number of students and death to several, and that the actions of the National Guard were without legal justification. They sought injunctive relief against the Governor to restrain him in the future from prematurely ordering National Guard troops to duty in civil disorders and an injunction to restrain leaders of the National Guard from future violation of the students' constitutional rights. They also sought a declaratory judgment that § 2923.55 of the Ohio Revised Code [2] is unconstitutional. The District Court held that the complaint failed to state a claim upon which relief could be granted and dismissed the suit. The Court of Appeals [3] unanimously affirmed the District Court's dismissal with respect to injunctive relief against the Governor's "premature" employment of the Guard on future occasions and with respect to the

_James M. Nabrit III, Charles Stephen Ralston,_ and _Drew S. Days III_ for the NAACP Legal Defense and Educational Fund, Inc.

[1] The complaint was brought under 42 U. S. C. § 1983 with jurisdiction asserted under 28 U. S. C. § 1343 (3).

[2] This section provides that, under certain circumstances, law enforcement personnel who are engaged in suppressing a riot are "guiltless" for the consequences of the use of necessary and proper force. Ohio Rev. Code Ann. § 2923.55 (Supp. 1972).

[3] The opinion of the Court of Appeals is reported _sub nom. Morgan_ v. _Rhodes,_ 456 F. 2d 608 (CA6 1972).

validity of the state statute.[4] At the same time, however, the Court of Appeals, with one judge dissenting, held that the complaint stated a cause of action with respect to one issue which was remanded to the District Court with directions to resolve the following question:

> "Was there and is there a pattern of training, weaponry and orders in the Ohio National Guard which singly or together require or make inevitable the use of fatal force in suppressing civilian disorders when the total circumstances at the critical time are such that nonlethal force would suffice to restore order and the use of lethal force is not reasonably necessary?"[5]

We granted certiorari to review the action of the Court of Appeals.[6]

## I

We note at the outset that since the complaint was filed in the District Court in 1970, there have been a number of changes in the factual situation. At the oral argument, we were informed that none of the named respondents is still enrolled in the University.[7] Likewise, the officials originally named as party defendants no longer hold offices in which they can exercise any authority over the State's National Guard,[8] although the suit is against such parties and their successors in office. In addition, both the petitioners, and the Solicitor General appearing as *amicus curiae,* have informed us that since 1970 the Ohio National Guard has adopted new "use of force" rules substantially differing from those in

---

[4] Respondents have not sought certiorari with respect to those claims.

[5] *Id.,* at 612.

[6] 409 U. S. 947 (1972).

[7] Tr. of Oral Arg. 25, 33.

[8] Memorandum of Petitioners Suggesting a Question of Mootness 2.

effect when the complaint was filed; we are also informed that the initial training of National Guard recruits relating to civil disorder control[9] has been revised.

Respondents assert, nevertheless, that these changes in the situation do not affect their right to a hearing on their entitlement to injunctive and supervisory relief. Some basis, therefore, exists for a conclusion that the case is now moot; however, on the record before us we are not prepared to resolve the case on that basis and therefore turn to the important question whether the claims alleged in the complaint, as narrowed by the Court of Appeals' remand, are justiciable.

## II

We can treat the question of justiciability on the basis of an assumption that respondents' claims, within the framework of the remand order, are true and could be established by evidence. On that assumption, we address the question whether there is any relief a District Court could appropriately fashion.

It is important to note at the outset that this is not a case in which damages are sought for injuries sustained during the tragic occurrence at Kent State. Nor is it an action seeking a restraining order against some specified and imminently threatened unlawful action. Rather, it is a broad call on judicial power to assume continuing regulatory jurisdiction over the activities of the Ohio National Guard. This far-reaching demand for relief presents important questions of justiciability.

Respondents continue to seek for the benefit of all Kent State students a judicial evaluation of the appropriateness of the "training, weaponry and orders" of the Ohio

---

[9] In 1971, the Army began to give National Guard recruits 16 hours of additional special civil-disturbance-control training recognizing the peculiar role of the National Guard in this area.

National Guard. They further demand, and the Court
of Appeals' remand would require, that the District Court
establish standards for the training, kind of weapons and
scope and kind of orders to control the actions of the
National Guard. Respondents contend that thereafter
the District Court must assume and exercise a continuing
judicial surveillance over the Guard to assure compliance
with whatever training and operations procedures may
be approved by that court. Respondents press for a
remedial decree of this scope, even assuming that the re-
cently adopted changes are deemed acceptable after an
evidentiary hearing by the court. Continued judicial
surveillance to assure compliance with the changed
standards is what respondents demand.

In relying on the Due Process Clause of the Fourteenth
Amendment, respondents seem to overlook the explicit
command of Art. I, § 8, cl. 16, which vests in Congress
the power:

> "To provide for organizing, arming, and disciplin-
> ing the Militia, and for governing such Part of them
> as may be employed in the Service of the United
> States, reserving to the States respectively, the Ap-
> pointment of the Officers, and the Authority of
> training the Militia according to the discipline *pre-
> scribed by Congress.*" (Emphasis added.)

The majority opinion in the Court of Appeals does not
mention this very relevant provision of the Constitution.
Yet that provision is explicit that the Congress shall have
the responsibility for organizing, arming, and disciplin-
ing the Militia (now the National Guard), with certain
responsibilities being reserved to the respective States.
Congress has enacted appropriate legislation pursuant
to Art. I, § 8, cl. 16,[10] and has also authorized the Presi-

---

[10] *E. g.*, 32 U. S. C. §§ 105, 501–507, 701–714 (1970 ed. and
Supp. I).

dent—as the Commander in Chief of the Armed Forces—to prescribe regulations governing organization and discipline of the National Guard.[11] The Guard is an essential reserve component of the Armed Forces of the United States, available with regular forces in time of war. The Guard also may be federalized in addition to its role under state governments, to assist in controlling civil disorders.[12] The relief sought by respondents, requiring initial judicial review and continuing surveillance by a federal court over the training, weaponry, and orders of the Guard, would therefore embrace critical areas of responsibility vested by the Constitution in the Legislative and Executive Branches of the Government.[13]

The Court of Appeals invited the District Court on remand to survey certain materials not then in the record of the case:

> "[F]or example: Prevention and Control of Mobs and Riots, Federal Bureau of Investigation, U. S. Dept. of Justice, J. Edgar Hoover (1967) . . . ; 32 C. F. R. § 501 (1971), 'Employment of Troops in Aid of Civil Authorities'; Instructions for Members of the Force at Mass Demonstrations, Police Department, City of New York (no date); Report of the National Advisory Commission on Civil Disorders (1968)." 456 F. 2d, at 614.

---

[11] 32 U. S. C. § 110.

[12] 10 U. S. C. § 331 *et seq.*

[13] The initial and basic training of National Guard personnel is, by Regulation of the Department of the Army, pursuant to statutory authority, under federal jurisdiction. Commencing in 1971, National Guard units received, as part of the basic training, 16 hours of special civil-disturbance-control training, in recognition of the likelihood that the National Guard would be the primary source of military personnel called into civil disorder situations. See Dept. of the Army, Reserve Enlistment Program of 1963, CON Supp. 1 to AR350-1, App. XXV, Anx. F, Par. 3c (Aug. 31, 1972).

This would plainly and explicitly require a judicial evaluation of a wide range of possibly dissimilar procedures and policies approved by different law enforcement agencies or other authorities; and the examples cited may represent only a fragment of the accumulated data and experience in the various States, in the Armed Services, and in other concerned agencies of the Federal Government. Trained professionals, subject to the day-to-day control of the responsible civilian authorities, necessarily must make comparative judgments on the merits as to evolving methods of training, equipping, and controlling military forces with respect to their duties under the Constitution. It would be inappropriate for a district judge to undertake this responsibility in the unlikely event that he possessed requisite technical competence to do so.

Judge Celebrezze, in dissent, correctly read *Baker* v. *Carr*, 369 U. S. 186 (1962), when he said:

> "I believe that the congressional and executive authority to prescribe and regulate the training and weaponry of the National Guard, as set forth above, *clearly precludes any form of judicial regulation of the same matters.* I can envision no form of judicial relief which, if directed at the training and weaponry of the National Guard, would not involve a serious conflict with a
> " 'coordinate political department; . . . a lack of judicially discoverable and manageable standards for resolving [the question]; . . . the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; . . . the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; . . . an unusual need for unquestioning adherence to a

political decision already made; [and] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.' Baker v. Carr, *supra,* 369 U. S. at 217 . . . . *"Any such relief,* whether it prescribed standards of training and weaponry or simply ordered compliance with the standards set by Congress and/or the Executive, *would necessarily draw the courts into a nonjusticiable political question, over which we have no jurisdiction."* 456 F. 2d, at 619 (emphasis added).

In *Flast* v. *Cohen,* 392 U. S. 83 (1968), this Court noted that:

"Justiciability is itself a concept of uncertain meaning and scope. Its reach is illustrated by the various grounds upon which questions sought to be adjudicated in federal courts have been held not to be justiciable. Thus, no justiciable controversy is presented when the parties seek adjudication of only a political question, when the parties are asking for an advisory opinion, when the question sought to be adjudicated has been mooted by subsequent developments, and when there is no standing to maintain the action. Yet it remains true that '[j]usticiability is . . . not a legal concept with a fixed content or susceptible of scientific verification. Its utilization is the resultant of many subtle pressures . . . .' *Poe* v. *Ullman,* 367 U. S. 497, 508 (1961)." [14]

In determining justiciability, the analysis in *Flast* thus suggests that there is no justiciable controversy (a) "when the parties are asking for an advisory opinion," (b) "when the question sought to be adjudicated has been mooted by subsequent developments," and

---

[14] 392 U. S., at 95 (footnotes omitted).

(c) "when there is no standing to maintain the action." As we noted in *Poe* v. *Ullman,* 367 U. S. 497 (1961), and repeated in *Flast,* "[j]usticiability is . . . not a legal concept with a fixed content or susceptible of scientific verification. Its utilization is the resultant of many subtle pressures . . . ." 367 U. S., at 508.

In testing this case by these standards drawn specifically from *Flast,* there are serious deficiencies with respect to each. The advisory nature of the judicial declaration sought is clear from respondents' argument and, indeed, from the very language of the court's remand. Added to this is that the nature of the questions to be resolved on remand are subjects committed expressly to the political branches of government. These factors, when coupled with the uncertainties as to whether a live controversy still exists and the infirmity of the posture of respondents as to standing, render the claim and the proposed issues on remand nonjusticiable.

It would be difficult to think of a clearer example of the type of governmental action that was intended by the Constitution to be left to the political branches directly responsible—as the Judicial Branch is not—to the electoral process. Moreover, it is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches. The ultimate responsibility for these decisions is appropriately vested in branches of the government which are periodically subject to electoral accountability. It is this power of oversight and control of military force by elected representatives and officials which underlies our entire constitutional system; the majority opinion of the

Court of Appeals failed to give appropriate weight to this separation of powers.[15]

Voting rights cases such as *Baker* v. *Carr,* 369 U. S. 186 (1962), *Reynolds* v. *Sims,* 377 U. S. 533 (1964), and prisoner rights cases such as *Haines* v. *Kerner,* 404 U. S. 519 (1972), are cited by the court as supporting the "diminish[ing] vitality of the political question doctrine." 456 F. 2d, at 613. Yet, because this doctrine has been held inapplicable to certain carefully delineated situations, it is no reason for federal courts to assume its demise. The voting rights cases, indeed, have represented the Court's efforts to strengthen the political system by assuring a higher level of fairness and responsiveness to the political processes, not the assumption of a continuing judicial review of substantive political judgments entrusted expressly to the coordinate branches of government.

In concluding that no justiciable controversy is presented, it should be clear that we neither hold nor imply that the conduct of the National Guard is always beyond judicial review or that there may not be accountability in a judicial forum for violations of law or for specific

---

[15] In a colloquy with the Court on the scope of the relief sought under the remand, one Justice asked:

"Would it be a fair characterization of your position that if the case goes back to the district court, you do not quarrel with the specific [National Guard] regulations now in force but (a) you want them made permanent and, (b) you want a continuing surveillance to see that they are carried out; is that a fair statement of your case?"

Mr. Geltner, counsel for respondents, answered:

"Yes, Your Honor, that is a fair statement of what we are seeking at this point, understanding that at the time the complaint was filed we were seeking a more specific change in what then existed." Tr. of Oral Arg. 56.

unlawful conduct by military personnel,[16] whether by way of damages or injunctive relief. We hold only that no such questions are presented in this case. We decline to require a United States District Court to involve itself so directly and so intimately in the task assigned that court by the Court of Appeals. *Orloff* v. *Willoughby,* 345 U. S. 83, 93–94 (1953).

*Reversed.*

MR. JUSTICE DOUGLAS, MR. JUSTICE BRENNAN, MR. JUSTICE STEWART, and MR. JUSTICE MARSHALL dissent. For many of the reasons stated in Part I of the Court's opinion, they are convinced that this case is now moot. Accordingly, they would vacate the judgment of the Court of Appeals and remand the case to the District Court with directions to dismiss it as moot. See *United States* v. *Munsingwear, Inc.,* 340 U. S. 36, 39.

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE POWELL joins, concurring.

Respondents brought this action in 1970 seeking broad-ranging declaratory and injunctive relief. But the issue presently before the Court relates only to a portion of the relief sought in 1970. Under the Court of Appeals' remand order the District Court was limited in its review to determining the existence of a pattern of "training, weaponry and orders in the Ohio National Guard which

---

[16] See *Duncan* v. *Kahanamoku,* 327 U. S. 304 (1946); *Sterling* v. *Constantin,* 287 U. S. 378 (1932). In *Laird* v. *Tatum,* 408 U. S. 1, 15–16 (1972), we said: "[W]hen presented with claims of judicially cognizable injury resulting from military intrusion into the civilian sector, federal courts are fully empowered to consider claims of those asserting such injury; there is nothing in our Nation's history or in this Court's decided cases, including our holding today, that can properly be seen as giving any indication that actual or threatened injury by reason of unlawful activities of the military would go unnoticed or unremedied."

singly or together require or make inevitable" the unjustifiable use of lethal force in suppressing civilian disorders. 456 F. 2d 608, 612. The Ohio use-of-force rules have now been changed, and are identical to the Army use-of-force rules. Counsel for respondents stated at oral argument that the use-of-force rules now in effect provide satisfactory safeguards against unwarranted use of lethal force by the Ohio National Guard. Tr. of Oral Arg. 31. And, as of 1971, special civil-disturbance-control training had been provided for the various National Guard units.

It is in this narrowly confined setting that we are asked to decide the issues presented in this case. Respondents have informed us that they seek no change in the current National Guard regulations; rather, they wish to assure their continuance through constant judicial surveillance of the orders, training, and weaponry of the Guard.

Were it not for the continuing surveillance respondents seek, I would have little difficulty concluding that the controversy is now moot. Except for that aspect of the case, all relief requested by respondents has been obtained. While one might argue that the likelihood of future changes in the rules is so attenuated that even the claim for continuing review by the District Court is moot, this issue need not be reached, as the District Court is clearly without power to grant the relief now sought.

Respondents' complaint rests upon a single, isolated, and tragic incident at Kent State University. The conditions that existed at the time of the incident no longer prevail. And respondents' complaint contains nothing suggesting that they are likely to suffer specific injury in the future as a result of the practices they challenge. See *Laird* v. *Tatum,* 408 U. S. 1, 14 (1972). A complaint based on a single past incident, containing allega-

tions of unspecified, speculative threats of uncertain harm that might occur at some indefinite time in the future, cannot support respondents' standing to maintain this action. See Complaint, par. 11, App. 5–6; *Roe* v. *Wade*, 410 U. S. 113, 128 (1973).

The relief sought by respondents, moreover, is beyond the province of the judiciary. Respondents would have the District Court, through continuing surveillance, evaluate and pass upon the merits of the Guard's training programs, weapons, use of force, and orders. The relief sought is prospective only; an evaluation of those matters in the context of a particular factual setting as a predicate to relief in the form of an injunction against continuing activity or for damages would present wholly different issues. This case relates to prospective relief in the form of judicial surveillance of highly subjective and technical matters involving military training and command. As such, it presents an "[inappropriate] . . . subject matter for judicial consideration," for respondents are asking the District Court, in fashioning that prospective relief, "to enter upon policy determinations for which judicially manageable standards are lacking." *Baker* v. *Carr*, 369 U. S. 186, 198, 226 (1962).

For these reasons the judgment of the Court of Appeals must be reversed. On the understanding that this is what the Court's opinion holds, I join that opinion.