**David E. BRUTON et al.,
Plaintiffs,**

**v.**

**C. C. SCHNIPKE, Adjutant General of
the State of Michigan, et al.,
Defendants.**

**Civ. A. No. 74-70467.**

United States District Court,
E. D. Michigan, S. D.

Feb. 15, 1974.

Joel M. Shere, Shere & Klein, Detroit, Mich., for plaintiffs.

James Prochnow (prepared briefs & argued), Justice Dept., Washington, D. C., Gwen Carr, Asst. U. S. Atty., Detroit, Mich. (local counsel) for defendants.

## OPINION
## ON MOTION FOR TEMPORARY INJUNCTION

KENNEDY, District Judge.

Two of the named plaintiffs in this action, RICHARD S. WELLS and RO-

LAND L. BYYKKONEN, seek a preliminary injunction directing defendants to reinstate them in their former positions as Air National Guard technicians. Both plaintiffs were discharged for refusal to wear the military uniform during their regular 40-hour work week. Plaintiffs WELLS and BYYKKONEN also seek damages. In addition, all of the plaintiffs seek a preliminary injunction restraining defendants from enforcing or implementing Air National Guard Regulation 40–01, which requires the wearing of the uniform during the work week.[1] The complaint also requests a permanent injunction to the same effect.

Defendants' response to plaintiffs' motion for preliminary injunction asserts among other defenses that this Court lacks subject matter jurisdiction. Plaintiffs' complaint alleged jurisdiction on four bases: 1) mandamus, 28 U.S.C. § 1361; 2) federal question, where the amount in controversy exceeds $10,000, 28 U.S.C. § 1331(a); 3) the Administrative Procedure Act, 5 U.S.C. §§ 702–704; and 4) deprivation of civil rights under color of State law, 28 U.S.C. § 1343(3). Defendants contend that the Court lacks subject matter jurisdiction over plaintiffs' action. Oral arguments were first held on the jurisdictional issues only, at which time plaintiffs conceded that they were not entitled to mandamus relief under the facts alleged and withdrew their claim of jurisdiction on that first basis. As to plaintiffs' second alleged basis of jurisdiction, the Court ruled that there was federal question jurisdiction under 28 U.S.C. § 1331(a) as to plaintiffs BYYKKONEN and WELLS only. Defendants had previously conceded that such jurisdiction existed if the amount in controversy as to these plaintiffs exceeded $10,000. Having examined these plaintiffs' affidavits and the allegations of the complaint, the Court cannot conclude to a legal certainty that the claim of either is for less than the jurisdictional amount. See St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed. 845 (1938).

With regard to plaintiffs' third allegation of jurisdictional basis, the question of whether the Administrative Procedure Act is an independent source of Federal jurisdiction is one upon which there is a sharp split of authority among the United States Circuit Courts of Appeals. Writers of texts and law review articles on the subject of administrative law have not been able to reconcile these decisions or to agree upon the desirability of such a construction. Plaintiffs argued that the United States Court of Appeals for the Sixth Circuit, although it had not directly spoken to the issue, had inferentially ruled that the Administrative Procedure Act created an independent jurisdictional basis when in Sierra Club v. Hickel, 467 F.2d 1048 (1972), cert. denied, Sierra Club v. Morton, 411 U.S. 920, 93 S.Ct. 1545, 36 L.Ed.2d 313, it held that defendant was immune from suit rather than dismiss the plaintiff's claim for lack of jurisdiction. The jurisdictional basis for plaintiff Sierra Club's complaint was the Administrative Procedure Act.

Subsequent to the oral arguments on the jurisdictional issues the Sixth Circuit spoke to this issue in Bramblett v. Desobry, 490 F.2d 405, *per curiam* Jan. 8, 1974. With little discussion the Court of Appeals flatly states that "the A.P.A. [Administrative Procedure Act] does not confer jurisdiction on the courts. Yahr v. Resor, 339 F. Supp. 964 (D.N.C.1972); Ove Gustavsson Contracting Co. v. Floete, 278 F.2d 912 (2d Cir. 1960)." *Bramblett, supra,* at p. 407. The *Ove Gustavsson* opinion is one of the leading cases holding that the A.P.A. is not an independent source of Federal jurisdiction. This Court considers itself bound by the *Bramblett* decision, *supra,* and holds that as to plaintiffs' claim for relief under the Admin-

---

1. Plaintiffs do not object to the wearing of the uniform during the monthly weekend drills, in which all National Guardsmen participate.

**1160**

istrative Procedure Act, the Court lacks jurisdiction.

 Certain of the defendants, such as C. C. SCHNIPKE, Adjutant General of the State of Michigan, are State employees. Plaintiffs' fourth allegation of jurisdiction is under 28 U.S.C. 1343(3), the jurisdictional statute for the Civil Rights Acts. No cause of action is stated under the Civil Rights Acts, however, since it is not alleged that any defendant has acted "under color of any State law, statute, ordinance, regulation, custom or usage." Moreover, it was conceded that all defendants acted pursuant to the Federal regulation referred to above.

Air National Guard Regulation 40–01, promulgated by the Secretary of the Air Force on January 1, 1969, provides as follows:

> Wearing of the Uniform. Technicians in the excepted service will wear the military uniform appropriate to their service and federally recognized grade when performing technician duties. When the uniform is deemed inappropriate for specific positions and functions, adjutants general may authorize other appropriate attire. If the adjutant general exercises this prerogative, this does not entitle technicians to payment of a uniform allowance authorized for Department of Defense civilian personnel.

As of January 1, 1969, air technicians became employees of the Department of the Air Force. Prior to that time they had been employees of their respective states, although Federal monies were provided to the states for their salaries.

Prior to 1969, National Guard Air technicians in Michigan had worn the military uniform. They continued to do so until 1971, when, after discussions and conferences between the State Adjutant General, C. C. SCHNIPKE, and the Association of Civilian Technicians, Inc. [ACT, Inc.], the bargaining agent for air technicians, the Adjutant General issued a directive making the wearing of the military uniform optional at two of the three Air National Guard bases in Michigan, Selfridge Air Force Base and Battle Creek Air National Guard Base. The uniform requirement remained in effect at the Air Force base in Alpena, Michigan, Phelps-Collins Air National Guard Base.

Major General Francis S. Greenlief, United States Army, Chief of the National Guard Bureau, Departments of the Army and the Air Force, testified that he was not aware of the practice in Michigan, and in some other states as well, of permitting technicians to wear non-military garb. He testified that when he made inspection or other tours of bases in the states the technicians were always in uniform. The fact that some units were not wearing the military uniform came to his attention only when collective bargaining agents for technicians pointed out the disparity of treatment. The matter of the regulation and requirement that technicians wear uniforms was discussed at meetings of the Adjutant Generals of the 50 States, Puerto Rico, and the District of Columbia, and with the Advisory Council of the National Guard. Both groups were overwhelmingly in favor of the requirement. At the time there was litigation pending in the United States District Court for the District of Columbia with respect to the Constitutionality of the National Guard technician statute, particularly the requirement that National Guard technicians must be and remain members of the National Guard in order to obtain and continue their employment. That District court upheld the Constitutionality of the requirement that technicians be members in good standing of the National Guard or Air National Guard. General Greenlief testified that the National Guard Bureau waited for the court's decision in that case before reiterating and implementing the enforcement of the uniform regulation.

General Greenlief then issued a letter to "The Adjutants General of all States, Puerto Rico and the District of Columbia," calling attention to the requirement that all air technicians wear military uniforms. This requirement was

further implemented by State Adjutant Generals' regulations.

Plaintiffs WELLS and BYYKKONEN refused to wear the military uniforms, and they were discharged. All available administrative appeals have been pursued, and relief has been denied.

It should be noted that concomitant with the requirement of wearing the military uniform is the requirement of military courtesy, i. e., saluting, form of address, the military manner of giving orders, etc. The wearing of the uniform also requires military grooming standards to be observed, including hair length and style. So far as outward appearance and daily conduct are concerned, plaintiffs if wearing the uniform would be required to act and appear as if on active military duty.

Plaintiffs assert that the requirement that they wear the military uniform violates the due process clause of the Fifth Amendment. This amendment, they assert, forbids arbitrary infringement of their liberties. Thus, they do not claim that they have a Constitutional right to choice of dress or hair style, but they do insist that there must be a reasonable relationship between the regulation and some legitimate Governmental—here, National Guard—purpose.

Plaintiffs liken the military uniform requirement to the hair and dress requirements of students in schools. The United States Court of Appeals for the Sixth Circuit in Jackson v. Dorrier, 424 F.2d 213 (1970), cert. denied 400 U.S. 850, 91 S.Ct. 55, 27 L.Ed.2d 88, and Gfell v. Rickelman, 441 F.2d 444 (1971), refused to accord Constitutional status to choice of hairstyle or dress but did examine the regulations under attack to ascertain whether they had a real and reasonable connection with the successful operation of the education system, the maintenance of discipline, the promotion of safety in certain course, and the furtherance of valid educational purpose, including the teaching of grooming, discipline and etiquette.

At the evidentiary hearings on the instant motion for preliminary injunction each side submitted several witnesses on the issue of whether the uniform requirement bears a reasonable relationship to the purpose and function of the Air National Guard technician's work. Plaintiffs called as a witness, DAVID E. BRUTON, a civilian jet engine technician, chairman of the Michigan Chapter Association of Civilian Technicians, Inc., and a master sergeant in the Air National Guard. He took issue with the purposes and benefits of the military uniform requirement for Air National Guard technicians as set forth by Major General Greenlief's letter of February 23, 1973 (Exhibit I) to all National Guard Adjutants General. Mr. BRUTON testified that:

1. The military fatigues currently required to be worn by Air National Guard technicians do not bear any ANG insignia and thus do not serve to identify the wearer as a member of the ANG as a military unit. Further, uniformed civilian technicians rarely come in contact with other civilians due to the security surrounding the military defense operation during working hours. Since sixty to seventy percent of the technicians do not wear their uniforms home from work they do not come in contact with civilians while wearing the uniforms to and from work;

2. The military technician uniforms are not designed to meet the military duties and climate encountered. The military uniform worn by a technician is the same regardless of whether he is stationed in Florida or Alaska. Further, the military uniform is not as functional as a wash-and-wear civilian uniform, which is more oil and stain retardant;

3. The military technician uniforms do not designate military rank, but rather civilian technician

rank, which does not necessarily correspond to a technician's true military rank. The military uniforms required to be worn by technicians cause active military officers on the base to mistake civilian technicians for members of the active military and to assign to technicians chores, such as carrying packages. Further, their duties as technicians require them to perform menial duties, such as sweeping floors, inappropriate to their military rank and status as sergeants. More confusing is the situation in which the uniformed technician refuses to obey the order of a military officer and attempts to explain that during the week as a civilian technician he need only take orders from his technician supervisor rather than from any ranking military officer. Thus, the uniforms do not facilitate performance of weekday civilian technician work but rather hinder such performance;

4. The military uniforms issued free-of-charge by the Government provide no financial advantage to technicians. Mr. BRUTON testified that it takes too much time to wash, starch, and iron the uniform in accordance with military regulation so he must pay $4.40 per week to have the uniform cleaned professionally; for this cost he could purchase a new wash-and-wear civilian uniform every two weeks;

5. Mr. BRUTON further testified that though the wearing of a military uniform may signify a technician's exemption from the Federal Civil Service exam, such exemption is not a privilege. Mr. BRUTON prefers to be subject to a competitive exam, which would have some meaning within the civilian technician force, in which the chain of authority would be acknowledged as corresponding to

technician proficiency level regardless of military rank;

6. The wearing of uniforms by technicians during the work week does not enhance unit integrity required for mobilization. Mr. BRUTON testified that during the period when the wearing of military uniforms was optional for technicians, he kept his military uniform in his locker at the base for use on weekends and mobilization. Mr. BRUTON believes that civilian technicians could don uniforms and mobilize just as quickly, if not more quickly, than the rest of the Air National Guardsmen.

Plaintiffs next called Major John W. Kimmerly, head of air maintenance for the Air National Guard at Selfridge, Michigan. Major Kimmerly testified that during the period when the wearing of uniforms was optional, he wore a uniform ninety-nine percent of the time because he was on "flying status" and found the coverall uniform with many pockets more convenient. He further testified that everyone in his unit is an air technician, that the only active military personnel affiliated with the unit are advisors, not supervisors, and that questions have arisen concerning who supervises whom relative to the uniform's display of rank since there are a few instances in which the supervisor holds a lower rank than the man he supervises.

Defendants' witness Colonel Warren K. Wells, technician personnel officer for the Michigan Air National Guard, testified that the mission itself, i. e., maintenance of a combat-ready unit, was better performed if technicians were in uniform because the uniform would make members feel that they belonged to the unit. He was unable to say one way or the other whether the wearing or non-wearing of uniforms affects the work quality of an individual employee's work.

Defendants next submitted the testimony of Lt. Colonel James Noble, logis-

tics management officer at Battle Creek. He testified that at Battle Creek there is some limited contact between civilians and technicians. He was not able to ascribe any increased effectiveness or inefficiency to any individual technician because he wore or did not wear the uniform.

Defendants' witness Major General Francis Greenlief, chief of the National Guard Bureau, testified that the purpose of the military uniform requirement for Air National Guard technicians is to improve "combat-readiness" of the Air National Guard. Summarized, General Greenlief testified that the technician force is an essential component of the military, that the work performed by the technician is purely military (there being no non-military purpose for the existence of the technician force), and that the wearing of the uniforms caused the technician force to be perceived as part of the military by both the civilian community and the military community. He further testified that uniforms are necessary and desirable because they 1) evidence membership in a military unit; 2) are specifically designed for military work in various climates; 3) save the airforce and the individual money since they are issued by the Government free of charge to the individual in lieu of a clothing allowance; and 4) contribute to a good inspection rating of the technician unit.

Major General Greenlief further testified that the National Guard is part of the "total forces concept" which undertakes to consider the number of military personnel needed for our national defense and military commitments; he emphasized the increased reliance on the Air National Guard to supply 35 percent of the tactical air force requirements. Because it is a part of the "total forces" and must be relied upon by the balance of military services, it is important, he stated, that these other military services have confidence in it.

■■ Weighing the testimony submitted by both sides, this Court might conclude that the wearing of the uniform was on balance, undesirable. However, it is not the Court's function to substitute its decision for that of the lawfully designated Governmental authority to which is delegated the regulation of the National Guard. The National Guard is a military organization. Its functions are primarily military. The reason for its existence is primarily military. All of the testimony supports the conclusion that technicians function in a more military fashion if they wear the military uniform. Indeed, it is because wearing the uniform requires plaintiffs to perform their work in a military way that they object. It does not seem unreasonable to have military work performed in a military manner. Given the National Guard's purpose and function the Court cannot say that the regulation is not reasonably related to the National Guard's purpose.

Article I, Section 8, paragraph 16 of the Constitution vests in Congress the power

> To provide for organizing, arming and disciplining the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States, respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline *prescribed* by Congress. (Emphasis added).

Section 709 of Title 32, United States Code, authorizes the employment of National Guard technicians. That statute provides in part:

> (a) Under regulations prescribed by the Secretary of the Army or the Secretary of the Air Force, as the case may be, and subject to subsection (b) of this section persons may be employed as technicians in—
>
> (1) the administration and training of the National Guard; and
>
> (2) the maintenance and repair of supplies issued to the National Guard or the armed forces.

(b) Except as prescribed by the Secretary concerned, a technician employed under subsection (a) shall, while so employed, be a member of the National Guard and hold the military grade specified by the Secretary concerned for that position.

\* \* \* \* \* \*

(d) A technician employed under subsection (a) is an employee of the Department of the Army or the Department of the Air Force, as the case may be, and an employee of the United States. However, a position authorized by this section is outside the competitive service if the technician employed therein is required under subsection (b) to be a member of the National Guard.

(e) Notwithstanding any other provision of law and under regulations prescribed by the Secretary concerned—

(1) a technician who is employed in a position in which National Guard membership is required as a condition of employment and who is separated from the National Guard or ceases to hold the military grade specified for his position by the Secretary concerned shall be promptly separated from his technician employment by the adjutant general of the jurisdiction concerned; . . . .

As pointed out by the United States Supreme Court in Gilligan v. Morgan, 413 U.S. 1, 6–7, 93 S.Ct. 2440, 2444, 37 L.Ed.2d 407 (1973), Congress has

authorized the President—as the Commander-in-Chief of the Armed Forces —to prescribe regulations governing organization and discipline of the National Guard. The Guard is an essential reserve component of the Armed Forces of the United States, available with regular forces in time of war. The Guard also may be federalized in addition to its role under state governments, to assist in controlling civil disorders.

Admittedly, the issues in the instant case are different from those in *Gilligan* where the court was asked not to restrain some specified and imminently threatened action but initially to review and thereafter to continue surveillance of the training and weaponry of the National Guard. However, the court's reasoning in that case does have application here. It pointed out:

Trained professionals, subject to the day to day control of the responsible civilian authorities, necessarily must make comparative judgments on the merits as to evolving methods of training, equipping, and controlling military forces with respect to their duties under the Constitution. It would be inappropriate for a district judge to undertake this responsibility, even if in the unlikely event that he possessed requisite technical competence to do so.

Judge Celebrezze in dissent correctly read Baker v. Carr when he said:

I believe that the congressional and and executive authority to prescribe and regulate the training and weaponry of the National Guard, as set forth above, *clearly precludes any form of judicial regulation of the same matters.* I can envision no form of judicial relief which, if directed at the training and weaponry of the National Guard, would not involve a serious conflict with a 'coordinate political department; . . . a lack of judicially discoverable and manageable standards for resolving [the question]; . . . the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; . . . the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government;

. . . an unusual need for unquestioning adherence to a political decision already made; [and] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.' Baker v. Carr, *supra*, 369 U.S. 186, at 217, 82 S.Ct. 691, at 710, 7 L.Ed.2d 663. . . . *Any such relief*, whether it prescribed standards of training and weaponry or simply ordered compliance with the standards set by Congress and/or the Executive, *would necessarily draw the courts into a nonjusticiable political question, over which we have no jurisdiction.* 456 F.2d, at 619. (Emphasis added).

*Gilligan, supra*, 413 U.S., at 8, 9, 93 S.Ct., at 2444, 2445.

The Chief Justice reiterated this position when he said:

[I]t is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches. The ultimate responsibility for these decisions are appropriately vested in branches of the government which are periodically subject to electoral accountability.

*Gilligan, supra*, 413 U.S., at 10, 93 S. Ct., at 2446.

It is only if there is some prohibition or restriction limiting the extent to which the air technicians can be required to work and conduct themselves as military persons that the instant regulation can be found to be invalid. Plaintiffs urge that the regulation here in question is a military intrusion into the civilian sector. They point to the facts that they are civilians; that they are not subject to the Code of Military Justice; that they and their families do not receive free medical care, as do the families of those on active military duty; that they and their families do not have the right to use the post exchange and other facilities provided for military personnel; and that they do not receive military retirement pay. However, the work they perform is military work performed for military reasons. Moreover, the requirement that technicians wear the military uniform was in existence when plaintiffs became technicians. The requirement then has historical support.

In view of the foregoing, it seems unlikely that plaintiffs will prevail on the merits of their request for an injunction.

■ With respect to the question of whether plaintiffs WELLS and BYYKKONEN will suffer irreparable harm, the Court finds that plaintiff WELLS will suffer irreparable harm by his continued absence from his employment in view of the changing and highly technical aspects of his job as an air technician. The Court finds that plaintiff BYYKKONEN has failed to establish that he would suffer irreparable harm if he were not reinstated. His work appears to be far less technical, and he has failed to persuade the Court that he could not keep reasonably current through his attendance at the monthly National Guard weekend training periods. He had substantial employment with the Prudential Insurance Company subsequent to his discharge. Thus, although his earnings now are very small, that is not because of his discharge from the National Guard but because he chose to leave the employ of the Prudential Insurance Company.

For all of the foregoing reasons, the Motion for a Preliminary Injunction is denied.