John DOE and Mary Doe, Plaintiffs,

v.

Louis W. SULLIVAN, Secretary, Department of Health and Human Services, and Richard Cheney, Secretary, Department of Defense, Defendants.

Civ. A. No. 91–51 SSH.

United States District Court, District of Columbia.

Jan. 31, 1991.

Michael Tankersley, Alan B. Morrison, Public Citizen Litigation Group, Washington, D.C., for plaintiffs.

Mona B. Alderson, Patricia M. Russotto, Civ. Div., Dept. of Justice, Washington, D.C., for defendants.

## OPINION

STANLEY S. HARRIS, District Judge.

This matter now is before the Court on plaintiffs' motion for a preliminary injunction and defendants' motion to dismiss. The motion for a preliminary injunction in effect was consolidated with a trial on the merits pursuant to Fed.R.Civ.P. Rule 65(a)(2). Plaintiffs seek an order enjoining the Department of Defense (DoD) from using unapproved drugs on troops taking part in Operation Desert Storm without first obtaining informed consent from the individual military personnel. Upon consideration of the entire record herein, for the reasons set forth below, plaintiffs' motion for a preliminary injunction is denied and defendants' motion to dismiss is granted.

### Background

In August 1990, the United States began deploying troops to Saudi Arabia in response to Iraq's unprovoked invasion of Kuwait. As Operation Desert Shield progressed toward the United Nations' deadline of January 15, 1991, for Iraq to withdraw from Kuwait, the DoD began planning for a possible war with Iraq. Because of well-publicized reports that Iraq has storehouses of chemical and biological weapons, the DoD developed plans to use certain drugs believed to have the ability to counteract the effects of such weapons on the troops. Some of the drugs have not yet received approval from the Food and Drug Administration (FDA) for distribution in the United States and, therefore, remain under the FDA classification of "investigational new drugs." Plaintiffs, a serviceman in the United States Army and his wife, seek an injunction preventing the DoD from using these unapproved drugs without first obtaining the informed consent of the military personnel taking part in the mission which is now known as Operation Desert Storm.

Shortly after Operation Desert Shield began, the DoD asked the FDA to recognize in its regulations that obtaining informed consent from military personnel before administering unapproved drugs is not feasible under circumstances of military exigency.[1] On December 21, 1990, the FDA published an interim rule that authorizes the Commissioner of Food and Drugs to determine that obtaining informed consent is not feasible in specific situations involving combat or the immediate threat of combat. 55 Fed.Reg. 52817 (to be codified at 21 C.F.R. 50.23(d)). Since the FDA adopted that interim rule, § 50.23(d), the Commissioner has concurred with the DoD's plans to administer two unapproved drugs to the

---

**1.** The DoD set forth its request in an October 30, 1990, letter which the FDA published in the Federal Register on December 21, 1990. The letter describes the drugs that the DoD plans to use:

These are not exotic new drugs; these drugs have well-established uses (although in contexts somewhat different from our requirements) and are believed by medical personnel in both DoD and FDA to be safe. For example, one product consists of a very commonly used drug packaged in a special intramuscular injector to make it readily useable by

soldiers on the battlefield. Another example involves a vaccine long recognized by the Centers for Disease Control as the primary preventive treatment available for a particular disease, but the relative infrequency of its use has slowed the accumulation of sufficient immunogenicity data to yet support full licensing of the product. Still another example involves a drug in common usage at a particular dosage level, but to preserve alertness of the soldiers, we prefer a lower-dosage tablet which is not an FDA approved product.
55 Fed.Reg. 52814.

troops in Operation Desert Storm. One of the drugs is a pretreatment to counteract the effects of organophosphate nerve agents. The other unapproved drug is a vaccine to prevent bacterial poisoning from biological warfare.

Plaintiffs challenge § 50.23(d) and the DoD's plans to administer unapproved drugs under the rule. Plaintiffs contend that § 50.23(d) violates the Food, Drug, and Cosmetic Act's (FDCA) limitations on using unapproved drugs on unconsenting humans. Plaintiffs further argue that § 50.23(d) marks a sharp departure from the FDA's longstanding regulations regarding the feasibility of obtaining informed consent. Citing the 1985 Department of Defense Authorization Act (DoD Act), which prohibits the use of DoD funds for research on involuntary human subjects, plaintiffs contend that the DoD plans to exceed the scope of its authority. Finally, plaintiffs argue that the use of unapproved drugs on military personnel without their informed consent constitutes a violation of their Fifth Amendment right to due process.

## Discussion

■ In deciding a motion for a preliminary injunction, the Court must consider whether four factors weigh in favor of issuing the injunction.

(1) Has petitioner made a strong showing that it is likely to prevail on the merits of its appeal? ... (2) Has the petitioner shown that without such relief, it will be irreparably injured? ... (3) Would the issuance of a stay substantially harm other parties interested in the proceedings? ... (4) Where lies the public interest?

*WMATA v. Holiday Tours, Inc.,* 559 F.2d 841, 842–43 (D.C.Cir.1977); *Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n,* 259 F.2d 921 (D.C.Cir.1958). Defendants argue that plaintiffs cannot show a likelihood of success on the merits because the DoD's decision to administer the unapproved drugs is a military decision that is not subject to judicial review. For the same reason, defendants contend that plaintiffs' claim should be dismissed.

A long line of cases backs defendants' argument that courts should not intrude on the "established relationship between enlisted military personnel and their superior officers." *Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983); *see Gilligan v. Morgan,* 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973); *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950); *United States v. Johnson,* 481 U.S. 681, 107 S.Ct. 2063, 95 L.Ed.2d 648 (1987); *United States v. Shearer,* 473 U.S. 52, 105 S.Ct. 3039, 87 L.Ed.2d 38 (1985); *Stencel Aero Engineering Corp. v. United States,* 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977). The cases note the special nature of military discipline and conclude that courts are "ill-equipped to determine the impact upon military discipline that any particular intrusion on military authority might have." *Chappell v. Wallace,* 462 U.S. at 305, 103 S.Ct. at 2368. The cases also rely on the Constitution's express delegation of the duty to oversee the armed forces to Congress, Art. 1, § 8, cls. 12–14, and the fact that Congress has enacted comprehensive statutes regulating military life. *Id.* In *Gilligan v. Morgan,* 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973), the Supreme Court construed Congress's analogous authority over the militia in a case seeking federal district court supervision over a state's National Guard. The *Gilligan* Court commented:

It would be difficult to think of a clearer example of the type of governmental action that was intended by the Constitution to be left to the political branches directly responsible—as the Judicial Branch is not—to the electoral process. Moreover, it is difficult to conceive of an area of governmental activity in which courts have less competence. The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches. The ultimate responsibility for these decisions is appropriately vested in

branches of the government which are periodically subject to electoral accountability.

*Id.* at 10, 93 S.Ct. at 2446.

The DoD's decision to use unapproved drugs is precisely the type of military decision that courts have repeatedly refused to second-guess. The DoD has elected to administer the drugs because of its determination that the drugs will improve the survival rate of troops that may encounter chemical and biological weapons. The DoD believes that protecting each individual serviceman, in turn, will increase the safety of other servicemen in the field and will decrease the medical burden of treating victims of chemical and biological weapons. Clearly, judicial interference in this type of strategic decision would not be proper. For this reason, plaintiffs' claim must be dismissed.[2]

■ Even if plaintiffs' claim were subject to judicial review, the Court would deny plaintiffs' motion for a preliminary injunction. Plaintiffs' claims under the DoD Act and the FDCA present issues of statutory construction and review of administrative action. The "starting point" in construing a statute is the statute's language. *American Tobacco Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982). When the statute's meaning is clear, courts do not have to resort to legislative history. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). "[I]f the statute is silent or ambiguous with respect to

the specific issue," courts afford deference to the statutory interpretation of an agency charged with administering the statute. *Id.* at 843, 104 S.Ct. at 2782. [T]he question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.*

■ The DoD's plans to administer unapproved drugs to the troops in Operation Desert Storm do not violate its authority under the DoD Act. The DoD Act prohibits the use of DoD funding "for any research involving a human being as an experimental subject," unless the subject's informed consent is obtained first. 10 U.S.C. § 980. The statute expressly requires informed consent even when the research is meant to be beneficial to the subject. *Id.* Plaintiffs argue that the DoD's use of unapproved drugs constitutes "research." They stress that, under FDA regulations, the DoD must collect data on the efficacy of the unapproved drugs. In addition, they contend that any use of unapproved drugs is research *per se*, despite the fact that the drugs are meant to be beneficial.[3]

Plaintiffs' definitional argument is not persuasive in light of the DoD Act's plain meaning. The DoD's use of unapproved drugs does not involve the type of scientific investigation under controlled circumstances that "research" connotes. On the contrary, the DoD has responded to very real circumstances and chosen what it views as the best alternative given current knowledge. The primary purpose of ad-

---

**2.** Plaintiffs' claim against the Secretary of Health and Human Services regarding the FDA's interim rule arguably does not implicate military discipline and strategy. Whether the fact that the interim rule was adopted at the DoD's request in preparing for possible war insulates it from the ordinary scope of judicial review is not clear. However, Congress delegated rulemaking authority regarding unapproved drugs to the FDA, which is part of the executive branch. 21 U.S.C. § 355(i). The FDA exercised that delegated authority in adopting § 50.23(d). The Supreme Court has cast the principle of judicial deference to the electoral branches in military matters in broad terms. *See, e.g., Chappell v. Wallace*, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983); *Gilligan v. Morgan*, 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973).

On balance, therefore, the Court believes that the interim rule is not reviewable. If the FDA's interim rule were subject to judicial review, plaintiffs' claim still would be denied for the reasons set forth in the Court's conditional holding that the rule is consistent with the FDCA and within the FDA's rulemaking authority.

**3.** Plaintiffs argue that using unapproved drugs must be "research" or it is in violation of § 505(i) of the FDCA, which limits unapproved drugs to "investigational use." Thus, plaintiffs contend that the DoD's application of unapproved drugs must be in violation of either the DoD Act or the FDCA, if it is not in violation of both.

ministering the drugs is military, not scientific. The fact that the DoD will collect information on the efficacy of the drugs does not transform the strategic decision to use the unapproved drugs in combat into research. Furthermore, the FDA has interpreted the FDCA to permit using unapproved drugs in a "treatment-investigational setting" in the past. *See* 21 C.F.R. §§ 312.34–35 (1990). The FDA, therefore, does not view every use of unapproved drugs as research, and nothing in the DoD Act suggests that Congress intended the term to have such a broad meaning. For this reason, the Court would deny plaintiffs' claim under the DoD Act.

■ Plaintiffs' challenge to the FDA's interim rule under the FDCA also must be denied. The FDCA requires the FDA to set standards for approving new drugs and to regulate the use of unapproved drugs. 21 U.S.C. § 355. The Act states that investigators must obtain informed consent before administering unapproved drugs to human subjects, "except where they deem it not feasible or, in their professional judgment, contrary to the best interests of such human beings." 21 U.S.C. § 355(i). The FDA adopted § 50.23(d) under the statutory exception for circumstances in which obtaining informed consent is not feasible. Plaintiffs challenge § 50.23(d) on the grounds that it allows a waiver of the informed consent requirement when, in fact, obtaining informed consent is feasible.

Before the FDA adopted § 50.23(d), longstanding FDA regulations stated that obtaining informed consent "is deemed feasible" unless the subject is unable to communicate, unconscious, or incompetent. *See* 21 C.F.R. § 50.23 (1990). The FDA added § 50.23(d) to its regulations to allow the Commissioner of Food and Drugs, at the DoD's request, to determine that obtaining informed consent is not feasible in specific combat circumstances. *See* Fed.Reg. at 52814–16. Section 50.23(d) requires the DoD to limit its request to "a specific military operation involving combat or the immediate threat of combat." 55 Fed.Reg. at 52817. The circumstances must be such that accomplishing the military mission and ensuring the safety of others requires using the drug "without regard to what might be any individual's personal preference for no treatment or for some alternative treatment." *Id.*

Plaintiffs argue that § 50.23(d) is not premised on the possibility or practicability of informing troops and requesting consent. Rather, the rule is designed to preclude the possibility that some military personnel may refuse to take the unapproved drugs. Plaintiffs also point out that the two drugs for which the DoD already has received clearance are pretreatments for which the DoD could supply information and consent forms.[4] Thus, plaintiffs argue, the interim rule violates the FDCA both on its face and in its actual application to the troops in Operation Desert Storm.

The FDA's interpretation of the term "feasible" in the FDCA is entitled to deference unless it is "arbitrary, capricious, or manifestly contrary to the statute." *See Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782.[5] In § 50.23(d), the FDA recognized that certain military concerns may make obtaining informed consent from military personnel in combat impracticable. The impracticability arises out of concern for the safety of the servicemen and the success of the mission. Although infeasibility in this situation differs from the form of infeasibility recognized in the FDA's previous regulations, it is well within the ordinary meaning of the term and the statute. Plaintiffs argue that the FDA's traditional interpretation of feasible, which focused on the subject's condition, marked the limits of

---

4. Plaintiffs note that the nerve gas pretreatment is self-administered and comes with instructions. Plaintiffs contend that the DoD could include information regarding the drug's unapproved status and an individual's right not to use it. Similarly, they argue, DoD could request informed consent when administering the vaccine to the troops.

5. "We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron*, 467 U.S. at 844, 104 S.Ct. at 2782. The Food, Drug, and Cosmetic Act expressly delegates authority to administer its provisions regarding unapproved drugs. 21 U.S.C. § 355(i).

infeasibility under the statute. Plaintiffs' interpretation would excuse informed consent only in circumstances when obtaining informed consent is impossible. The statute itself, however, does not dictate such a narrow construction of the term. Furthermore, the fact that § 50.23(d) differs from the FDA's previous regulations regarding informed consent does not diminish the deference accorded the FDA's interpretation of the statute. *See id.* at 863–64, 104 S.Ct. at 2792. The Court, therefore, can find no reason to disturb the FDA's interpretation of the FDCA or to second-guess the FDA's determination that it is infeasible to obtain informed consent before administering the two drugs the DoD plans to use. The Court, therefore, would deny plaintiffs' claim under the FDCA.

■ The third basis for plaintiffs' claim is that administering unapproved drugs to troops without first obtaining their informed consent deprives the troops of a liberty interest without due process of law in violation of the Fifth Amendment. The ordinary standard of scrutiny for alleged violations of substantive due process is whether the law or regulation is rationally related to a legitimate government purpose. *Nebbia v. New York*, 291 U.S. 502, 537, 54 S.Ct. 505, 78 L.Ed. 940 (1934); *West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937).[6] The DoD has asserted several interests underlying its decision to use the unapproved drugs. First, the drugs have as their goal protecting individual servicemen from the effects of chemical and biological weapons. Second, administering the drugs uniformly prevents unnecessary danger to troops and medical personnel from injury to, or the death of, fellow military personnel in battle. Finally, the DoD has an interest in successfully accomplishing the military goals of Operation Desert Storm.[7] The last two concerns certainly constitute legitimate government interests that may counterbalance an individual's interest in being free from experimental treatment without giving informed consent. *Cf. Jacobson v. Massachusetts*, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905) (government can compel smallpox vaccination to protect the public at large); *Goldman v. Weinberger*, 475 U.S. 503, 507, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986) (Air Force's interest in maintaining discipline and uniformity may outweigh individual's First Amendment interest in wearing a religious symbol with service uniform).

Administering unapproved drugs to troops without first obtaining informed consent must bear "a real and substantial relation" to the legitimate goals the DoD has asserted. *Nebbia*, 291 U.S. at 525, 54 S.Ct. at 510. If individual servicemen were allowed to refuse the unapproved drugs, the DoD would be forced to decide whether to excuse unconsenting servicemen from battle conditions in which they might encounter chemical or biological weapons. A decision not to send military personnel who refuse the drugs into battle could have a significant impact on battle strategy and the success of the mission. On the other hand, a decision to send military personnel into battle without the protection of the drugs could affect the safety of the individual servicemen and others in the field. As the government also argues, if an unprotected serviceman suffers nerve gas or bacterial poisoning, that serviceman will require the attention of other servicemen in the field, distracting them from the goals of the mission. To this distraction may be added the increased risk to military personnel running rescue missions and the increased burden on medical personnel and supplies. Uniformly administering the unapproved drugs avoids the dilemma posed by unconsenting individuals, advances the safety of the troops as a group,

---

**6.** If plaintiffs' constitutional challenge is subject to judicial review, the military context should decrease the level of scrutiny. *See Goldman v. Weinberger*, 475 U.S. 503, 507, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986). Because the Court finds that the DoD's actions survive scrutiny under the rational relation standard, it is not necessary to analyze the actions under any more deferential standard.

**7.** Listing these interests simply reaffirms the point that the DoD's decision to use unapproved drugs implicates military expertise and therefore is not subject to judicial review.

18

and promotes the DoD's overall goal of military success. The Court, therefore, finds that waiving the informed consent requirement is a rational means for the DoD to accomplish its legitimate goals. For this reason, the Court would deny plaintiffs' constitutional claim.

*Conclusion*

The DoD's plan to administer unapproved drugs to troops participating in Operation Desert Storm and the FDA's interim rule allowing the DoD to use the drugs without obtaining informed consent constitute strategic military decisions. The Court declines to second-guess the DoD's decisions regarding how to equip and prepare the armed forces for the war with Iraq. Accordingly, the Court grants defendants' motion to dismiss. Even if plaintiffs' claim did present a reviewable issue, the Court would enter judgment for the defendants. Section 50.23(d) is well within FDA's rulemaking authority under § 355(i) of the Food, Drug, and Cosmetic Act. Similarly, using unapproved drugs to protect troops facing possible exposure to chemical and biological weapons is not research on involuntary human subjects within the meaning of § 1401 of the Department of Defense Authorization Act of 1985. Finally, using the unapproved drugs to protect the troops advances legitimate government interests and does not violate individual military personnel's substantive due process rights. Because the Court enters judgment for the defendants, the Court finds that plaintiffs failed to demonstrate a significant likelihood of success on the merits. Accordingly plaintiffs' motion for a preliminary injunction is denied.