CANADY, C.J., concurring.
The manifest goal of the Petitioners and the dissenting justices is to put educational funding and educational policy firmly under the control of the judiciary. That is the only possible path forward once a judicial decision is made that "the State has failed to ensure that its allocations are the best use of funding," that "the State is not funding schools in an efficient manner," and that the State has not "allocate[d] resources in a productive manner and without waste." Dissenting op. at 153 (Pariente, J.). The response to such a judicial decision would involve judicial control of educational funding levels and judicial control of how educational funds are used. There is no reason to believe that the judiciary is competent to make these complex and difficult policy choices. And there is every reason to believe that arrogating *144 such policy choices to the judiciary would do great violence to the separation of powers established in our Constitution.
Contrary to the position of the Petitioners and the dissenters, the addition to the Constitution of the capaciously vague terms "efficient" and "high quality" cannot be understood to have wrought a revolution in the separation of powers. I therefore fully concur with the plurality opinion's view that going down the path charted by the Petitioners and the dissenters would be inconsistent with this Court's precedent in Coalition for Adequacy & Fairness in School Funding, Inc. v. Chiles , 680 So.2d 400 (Fla. 1996), that requires judicially manageable standards in order for the judiciary to intervene.
In striking down a delegation of legislative power to the executive, we previously held that "[t]he legislative responsibility to set fiscal priorities through appropriations is totally abandoned when the power to reduce, nullify, or change those priorities is given over to the total discretion of another branch of government." Chiles v. Children A, B, C, D, E, & F , 589 So.2d 260, 265 (Fla. 1991). We recognized the fundamental point that "[u]nder any working system of government, one of the branches must be able to exercise the power of the purse, and in our system it is the legislature, as representative of the people and maker of laws, including laws pertaining to appropriations, to whom that power is constitutionally assigned." Id. at 267. We emphasized the importance of this unique role played by the Legislature in controlling state spending:
The constitution specifically provides for the legislature alone to have the power to appropriate state funds. More importantly, only the legislature, as the voice of the people, may determine and weigh the multitude of needs and fiscal priorities of the State of Florida. The legislature must carry out its constitutional duty to establish fiscal priorities in light of the financial resources it has provided.
Id.
Of course, this does not mean that the judiciary in adjudicating individual constitutional claims can never make decisions that have an impact on state spending. But it does mean that the judiciary cannot take over the appropriations process and policymaking concerning the use of state funds for the public school system. If the judiciary does so, it strikes a grievous blow against the constitutional separation of powers. And that is exactly what the Petitioners and the dissenters would have us do. This is not a case in which a constitutional attack is made on specific identified actions of the government that have violated the Constitution. Instead, it is a challenge based on particular conditions that allegedly offend the Constitution and that are assumed to result from a complex series of deficient actions of the State-involving appropriations and the use of appropriated funds-that remains unidentified.
At its core, this is a case in search of a remedy. Or more to the point, it is a case in search of a remediator. In brief, the Petitioners and the dissenters take the position that educational funding and policy in Florida are not working as well as they should, and that the judiciary should figure out how funding and policy can work better. The judiciary is very good at making certain types of decisions-that is, judicial decisions. But it lacks the institutional competence-or the constitutional authority-to make the monumental funding and policy decisions that the Petitioners and the dissenters seek to shift to the judicial branch. And there is not a hint of any manageable judicial standards to apply *145 in making those decisions. Instead, if the Petitioners and the dissenters had their way, judges would simply apply their own policy preferences. This collides with the basic principle of our constitutional structure that "[t]he judicial power of the state extends" only to "controversies justiciable in their nature." Burnett v. Greene , 97 Fla. 1007, 122 So. 570, 575 (1929).
The Supreme Court has held that the doctrine of justiciability can require the rejection of "a broad call on judicial power to assume continuing regulatory jurisdiction over the activities" of a coordinate branch of government. Gilligan v. Morgan , 413 U.S. 1, 5, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973). Such "continuing regulatory jurisdiction" exercised by the judiciary over educational spending and policymaking is exactly what is at issue in this case. Here, this Court properly turns aside the quest of the Petitioners and the dissenters for "the assumption of a continuing judicial review of substantive political judgments entrusted expressly to" a coordinate branch of government. Id. at 11, 93 S.Ct. 2440. This result is required by the fundamental structure of our constitutional system and by the very nature of judicial power.
LAWSON, J., and EDWARD C. LaROSE, Associate Justice, concur.