Wallace GANT, Jr., Plaintiff,

v.

Edward C. BINDER, Adjutant General, Nebraska Army-Air National Guard; State of Nebraska; Robert Kerrey, Governor of Nebraska; Lloyd Johnson, Brig. General, Chief of Staff NEANG; Richard Bertrand, Colonel and Commander, NEANG; James F. McMurray, Major, Base Services Officer, NEANG; Richard Wade, Executive Support Staff Officer, NEANG; and James F. Bryant, Vincent D. Brown, Robert M. Courtney, Mary J. Kight, Lowell D. Closner, Randolph M. Scott, Kenneth W. Orr, Jerome E. Dickey, Members of the Nebraska Enlisted Selective Retention Appeals Board; individually and in their official capacities, Defendants.

Civ. No. 83–L–194.

United States District Court, D. Nebraska.

Oct. 12, 1984.

Clyde A. Christian, Christian, Krieger & Swihart, Omaha, Neb., for plaintiff Gant.

Paul W. Madgett, Asst. U.S. Atty., Omaha, Neb., and Bernard L. Packett, Asst.

Atty. Gen., Lincoln, Neb., for defendants Binder, et al.

## MEMORANDUM OPINION

VAN PELT, Senior District Judge.

### FINDING OF FACTS

Plaintiff, Wallace Gant, Jr., filed this Complaint in April, 1983, under 42 U.S.C. §§ 1981, 1982, and 1983; 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. §§ 2000d and 2000e and the Fourteenth Amendment, alleging that this separation from the Nebraska Army-Air National Guard (NEANG) was the result of a discriminatory atmosphere within NEANG and personal discrimination directed toward the plaintiff, specifically by the principal defendants, officers in command of NEANG. Plaintiff is black. He was employed by NEANG as lead recruiter and held the rank of Senior Master Sergeant, E–8. Plaintiff requested relief in the form of temporary and permanent injunctions enjoining defendants from terminating his employment with NEANG and monetary awards for damages, back pay, attorney's fees and costs.

The principal defendants are the State of Nebraska, and its Governor, Robert Kerrey, in his capacity as commander-in-chief of the Nebraska National Guard; Major General Edward C. Binder, (since retired), Adjutant General of NEANG; Brigadier General Lloyd L. Johnson, Chief of Staff; Colonel Richard E. Bertrand, Commander; Lt. Colonel James F. McMurray, Base Services Officer, and Lt. Colonel Richard Wade, Executive Support Staff Officer. Eight additional defendants were members of the Nebraska Enlisted Selective Retention Appeals Review Board for August, 1982: CM Sgt. James F. Bryant, Lt. Colonel Vincent D. Brown, Lt. Colonel Lowell D. Closner, CM Sgt. Robert M. Courtney, Master Sgt. Jerome E. Dickey, Captain Mary L. Kight, CM Sgt. Kenneth W. Orr, First Lt. Randolph M. Scott.

Prior to October 1, 1981, SMS Gant reported to Lt. Col. McMurray, who in turn as senior recruiter reported to Col. Bertrand. After October 1, 1981, plaintiff reported to Lt. Col. Wade, who reported to BGen. Johnson.

Plaintiff alleges that the acts of discrimination against him commenced in 1975 when he applied for and was denied a lieutenant's commission in the Air Force. At that point, he had been a member of NEANG since 1970. Despite Sgt. Gant's low scores on the AFO Qualifying Test, BGen. Johnson did everything he could to promote plaintiff's commission. However, the denial of this commission arose at the national level and was in part based upon plaintiff's prior record during his active service in the Air Force. Plaintiff was promoted to E–8, Senior Master Sergeant in 1976, the highest level authorized for the recruiting division in a State National Guard unit. By 1978, SMS Gant was senior recruiter in a supervisory capacity over the recruiting office. However, evidence shows that he was unable to handle this responsibility effectively. He was placed on work probation for 90 days during the summer of 1978. During this probationary period, Col. Bertrand scheduled several counseling meetings with plaintiff in order to help him improve his management of time and personnel. Gant did manage to improve his performance and was removed from probation in September, 1978.

However, sometime during 1979, Gant was relieved of his management duties and MS Brooks (E–7) became supervisor of the recruiting office. This rank inversion was objected to by plaintiff, who filed a discrimination complaint with National Guard Headquarters in Washington, D.C. To eliminate this rank inversion, SMS Gant was shifted to an office at ANG State Headquarters and given the title of Recruiting Liaison NCO with the specific responsibility for minority recruitments. In a letter dated June 3, 1980, by SMS Gant, responding to a verbal discussion with Lt. Col. Wade, plaintiff stated that he "was looking forward to working with you in this new role." Lt. Col. Wade's confirmation letter dated June 10, 1980, emphasized that the move was considered to be a step

up for Gant and that his responsibilities would not be less—only different.

Gant's personnel management problems were not yet solved. In September, 1980, Gant engaged in a loud confrontation with another recruiter in front of other staff and civilians. As a result, both Gant and the other recruiter were given reprimands.

Plaintiff maintains that he was an "outstanding recruiter" and that these personnel problems were the result of everyone else's racial biases. The record reflects a much different picture. From 1979–1982, Plaintiff had consistently recruited less than half the number of recruits of the next lowest recruiter and only one-third to one-fourth the number of the most productive recruiter. A national level recruiting officer, Major Thomas L. Daniels, who had been in charge of minority recruiting nation-wide from 1978–1980 and was chief recruiter from 1980 to 1981, stated that his experience showed a capable lead recruiter should be able to produce about two-thirds the recruits of a full-time production recruiter. In addition to Gant's poor recruiting record, his reports often contained errors or incomplete information which made it necessary for others to correct them before further processing. As a result of his poor performance, BGen. Johnson recommended that plaintiff "not be retained" when his term of enlistment was due to expire.

Plaintiff's enlistment term would have expired on January 19, 1983. However, because he was not fully eligible on that date for full retirement benefits based upon total years of active service, his term was extended until April 16, 1983, to give him a total service time of 28 years, one month, and eight days. MGen. Binder testified that he personally, and on his own initiative, requested the extension for SMS Gant from the National Guard Bureau.

Plaintiff's separation was considered under Air National Guard Regulation 39–06, which originally provided that all senior master sergeants with over 28 years of service were to be reviewed. Paragraph (2)(a)(2). Paragraph (2)(b) allowed Adju-

tants to adjust downward the number of years of satisfactory service required before separation as might be necessary to accommodate their State's personnel plan. Pursuant to this option, in January, 1982, MGen. Binder issued an amendment to Paragraph 2(a)(1) and (2) which reduced the years of satisfactory service chief master sergeants and senior master sergeants should serve prior to being reviewed for retention to 26. Separations under 39–06 are to be identified as "other than for cause." Major Daniels described regulation 39–06 as a management tool to be used to remove personnel who had reached the retirement level based on length of service.

SMS Gant was notified that he would be reviewed by the Selective Retention Board which met in April, 1982, to review all persons whose enlistments expired in 1983. There were a total of 26 individuals who were considered by this board. The Review Board had a summary record of plaintiff's performance and BGen. Johnson's recommendation. The Board voted to "non-retain" Gant and he appealed. His appeal was reviewed by the Selective Retention Appeals Review Board consisting of eight of the defendants in August, 1982. There was a white appellant in addition to SMS Gant. Both appellants were denied retention. MGen. Binder affirmed the Board's decision.

Plaintiff then waited until April, 1983, when he filed his complaint in Federal District Court for the State of Nebraska. A hearing was had in May, 1983, to determine whether or not a preliminary injunction should be granted. In an opinion issued July 22, 1983, the preliminary injunction was denied. A trial on the merits was then had May 7, 1984. This opinion follows.

## CONCLUSIONS OF LAW

### Jurisdiction

Plaintiff, SMS Gant, has alleged that his non-retention as lead recruiter in the Nebraska Army-Air National Guard was the culmination of a series of discriminatory acts based upon his race. Sgt. Gant is

black. Thus, he has met the first hurdle in establishing a case under 42 U.S.C. §§ 1981, 1982, and 1983, and 42 U.S.C. §§ 2000d and 2000e. Defendants argue that this case cannot be brought in Federal District Court under Section 1983 because the action complained of, the non-retention of Gant, was done under the authority of Air National Guard Regulation 39-06, a regulation promulgated by the National Guard Bureau. As a result, the action taken was federal, not state, and only state action is covered by Section 1983.

In addition, defendants contend that this action was not reviewable because it involved the military, not just any federal agency. Absent extraordinary circumstances, courts have been extremely reluctant to review military decision. *Orloff v. Willoughby*, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953); *Gilligan v. Morgan*, 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973). However, in holding that there was no justiciable controversy present in *Gilligan*, the Supreme Court said,

> [I]t should be clear that we neither hold nor imply that the conduct of the National Guard is always beyond judicial review or that there may not be accountability in a judicial forum for violations of law or for specific unlawful conduct by military personnel, ....

*Gilligan* at 11–12, 93 S.Ct. at 2446.

■ Two exceptions to the no-review-of-military-decisions rule are cases which contain allegations that military procedures violated the constitution or that the military has violated its own regulations. *Mindes v. Seaman*, 453 F.2d 197 (5th Cir.1971); *Evan v. National Guard Bureau*, unpublished, Civil No. 82–71970 (ED Mich., March 29, 1983) affm w/o opinion, 732 F.2d 154 (6th Cir.1984).

■ Racial discrimination, if present, is a serious violation of an individual's constitutional rights. In addition, plaintiff has alleged violations of his right to Due Process under the Fourteenth Amendment in connection with the procedures followed by NEANG to effect his non-retention and his appeal of that order. The seriousness of these allegations is sufficient to warrant a review of the actions of NEANG on a constitutional basis alone. The military, while entitled to special consideration as a result of its unique position within our government, is not exempt from constitutional mandates. *Alvarez v. Wilson*, 431 F.Supp. 136, (ND Ill.1977); *Bollen v. National Guard Bureau*, 449 F.Supp. 343 (WD Penn.1978). Furthermore, this is not a situation in which the Court is asked to review purely military matters of training and strategy as in *Gilligan*. Plaintiff's allegations of denial of due process go to the application of the regulations and are in the nature of a request to require the military to abide by the procedures which it set for itself to follow in reviewing personnel reenlistments. *Rucker v. Sec. of Army*, 702 F.2d 966 (11th Cir.1983); *Bluth v. Laird*, 435 F.2d 1065 (4th Cir.1970).

Defendants are correct that state action is required to bring a case in federal court under 1983, and that 1983 cannot be invoked to right wrongs which have been committed purely under the authority of Federal law. *Williams v. Rogers*, 449 F.2d 513 (8th Cir.1971) *cert. denied*, 405 U.S. 926, 92 S.Ct. 976, 30 L.Ed.2d 799 (1972). The analysis becomes more complex, however, when the entity or individuals alleged to have violated federal rights represent an integration of federal, state, and/or private authority. As to an integration between private action and state action, the United States Supreme Court has said, "[T]he inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity, so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metropolitan Edison Company*, 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974). Similar tests have been applied by the federal courts to the federal/state action dichotomy. *Junior Chamber of Commerce of Rochester, Inc., Rochester N.Y. v. U.S. Jaycees, Tulsa, Okla.* 495 F.2d 883, 887–88 (10th Cir.1974), *cert. denied* 419 U.S. 1026, 95 S.Ct. 505, 42 L.Ed.2d 301 (1974). Thus, Federal Courts,

when confronted with somewhat analogous cases brought against state national guard units, have generally found the nexus test, and thus the state action element of Section 1983, to be satisfied. *See: NeSmith v. Fulton,* 615 F.2d 196 (5th Cir.1980); *Rowe v. Tennessee,* 609 F.2d 259 (6th Cir.1979); *Bollen, supra.*

In addition, it has also been held that, because of the historical context of the Fourteenth Amendment and the Civil Rights Acts, a lesser showing of State involvement will be accepted where a case involves allegations of racial discrimination. *See: Jackson v. Statler Foundation,* 496 F.2d 623 (2d Cir.1974), *cert. denied,* 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1975); *Wagner v. Sheltz,* 471 F.Supp. 903 (D.Conn.1979).

■ The fact that Gant's non-retention was accomplished under the guidance of a federal regulation is not sufficient to shift the balance toward a finding of federal action.

First, one of the named defendants is Robert Kerrey, Governor of Nebraska. As such, he is also the commander-in-chief of the state militia which includes the Nebraska Air National Guard. *See:* The Constitution of Nebraska, Article IV, Section 14; *Neb.Rev.Stat.* Section 55–105 (Reissue 1978); *Neb.Rev.Stat.* Section 55–115 (Reissue 1978).

Second, Defendant General Edward Binder, Adjutant General, Nebraska Army-Air National Guard, was appointed by the Governor and, until his recent retirement, served as a type of state agency head.

Third, the remaining defendants are all members of the NEANG and, as such, are part of the Nebraska militia. *Neb.Rev. Stat. Id.*

Fourth, the Nebraska Legislature has set up an extensive statutory scheme to organize and regulate the NEANG. *Neb.Rev. Stat.* Sections 55–101 et seq. (Reissue 1978). Among these statutes is *Neb.Rev. Stat.* Section 55–102 (Reissue 1978) which gives the Governor the power to adopt rules and regulations promulgated by Congress for the administration and organization of armed forces of the United States as rules and regulations for the operation "of the military forces and militia of the state...." When so adopted, such federal regulations could be considered part of the body of state law.

Finally, ANGR 39–06 appears to be limited in effect in that it presents a statement of policy to guide the state national guard commanders in maintaining a viable force. As pointed out by defendants on page 40 of their post trial brief:

And, it is further obvious that ANGR 39–06 procedures were not intended to usurp the unit commander's decision in denying reenlistment. As indicated in the purpose of ANGR 39–06, paragraph 1, "Nothing in this regulation in any way restricts the authority of unit commanders to deny reenlistment." Similarly, in paragraph 2 to the change to ANGR 39–06, message 061900Z, March 1981, "(w)e wish to emphasize that there is no intent to usurp the authority of our unit commanders in the selective retention process."

Thus, by defendants' own admission, ANGR 39–06 can be viewed as less than exclusive authority in that it does not divest the officers of the Nebraska militia of any state authority they may hold. This is not the stuff of which federal action is made.

In sum, the Court finds sufficient state involvement in the non-retention of Gant to conclude that this case was properly brought under Section 1983.

Defendants sought a summary judgment based on the existence of absolute or qualified immunity as to defendants Binder, Johnson, Bertrand, McMurray, Wade and the members of the Enlisted Selective Retention Appeals Board. The State of Nebraska and Governor Kerrey were not included in this motion. Defendants further argued that plaintiff was precluded from suing his superior officers because of the *Feres* Doctrine. *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950).

The latest statement of the doctrine is found in *Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983). In *Chappell,* the respondents, five enlisted Navy personnel, brought action against their superior officers, seeking damages, declaratory judgment, and injunctive relief alleging that they were discriminated against on the basis of race. The Court noted the need to avoid disrupting the order of military hierarchy and held that "enlisted military personnel may not maintain a suit to recover *damages* from a superior officer for alleged constitutional violations." *Id.* at ——, 103 S.Ct. at 2367–68 (emphasis added). Implicit in both *Feres* and *Chappell* is the notion that a military officer, in making a decision, should not be forced to first hesitate and consider whether his order will subject him to liability. This logic certainly applies to both orders made on the battlefield and in the daily course of military affairs.

However, in the case at hand, plaintiff's complaint dealt with the administrative process which determined the future of his career at NEANG. The review of such a process is not the type of intrusion into military affairs that *Feres* and *Chappell* sought to prevent. Therefore, this Court concludes that *Chappell* only applies to this case in that it prohibits plaintiff from recovering monetary damages from the named members of NEANG.

In denying the motion for summary judgment, the Court noted that defendants were only entitled to qualified immunity, dependent upon a showing that defendants' "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). If the plaintiff had demonstrated in the course of the proceedings that defendants' actions were racially motivated, defendants would not have been able to claim the protection of this immunity. *Saldana v. Garza,* 684 F.2d 1159 (5th Cir. 1982), *cert. denied,* 460 U.S. 1012, 103 S.Ct. 1253, 75 L.Ed.2d 481 (1983). In addition, it should be understood that qualified immunity only protects against personal liability and does not extend to injunctive relief.

## MERITS

When the Court denied plaintiff's request for a preliminary injunction, the Court found no evidence that SMS Gant was the victim of racial discrimination, either in the terms and conditions of his employment or in his separation from NEANG. During the trial on the merits of plaintiff's complaint, he was unable to produce any additional evidence to support his claims.

In order to prove a claim of discriminatory treatment, the plaintiff must prove purposeful discrimination by a preponderance of the evidence. It is up to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Washington v. Davis,* 426 U.S. 229, 239–241, 96 S.Ct. 2040, 2047–48, 48 L.Ed.2d 597 (1976); *White v. Vathally,* 732 F.2d 1037, 1039–1040 (1st Cir.1984). However, the ultimate burden of persuasion lies with the plaintiff to rebut defendants' legitimate non-discriminatory reasons for their actions. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *White* at 1040.

Plaintiff first sought to show that the prevailing atmosphere in NEANG was discriminatory to blacks in general and, as a result, to himself specifically. His evidence sought to show that there were few black officers and an under-representation of blacks in the total NEANG population. Plaintiff further tried to establish the discriminatory atmosphere by showing attitudes of hostility towards blacks through the use of racial slurs and jokes by officers and enlisted men.

Gant places a great deal of reliance upon a report made by Major Ivan Kelley, Chief of Social Action, National Guard Bureau, Washington, D.C. In his official capacity,

Major Kelley had conducted a compliance review of NEANG in 1979 and a staff assistance visitation in 1981. The compliance review was conducted to determine how well the Social Action Program of the state was progressing and how minorities were being treated. The staff assistance visitation was made at the request of the Adjutant General (Major General Binder) for the purpose of locating weaknesses in the program and recommending improvements.

Major Kelley stated that, while there were still improvements which should be made in 1981, the Nebraska National Guard was much more in compliance by 1981 than in 1979. He went on to say that Nebraska's compliance level was about average when compared to other states' programs. Major Kelley admitted that he had interviewed SMS Gant in 1981 about Gant's complaints of racial discrimination, but denied that these complaints had prompted his visit. The 1981 visit was the result of a request by MGen. Binder, while the 1979 visit had been a routine stop in a series of state visits.

Neither 42 U.S.C. § 1983 nor the Fourteenth Amendment requires an employer to institute an affirmative action program. *Burdine* at 259, 101 S.Ct. at 1096; *Craik v. Minnesota State University Board*, 731 F.2d 465, 472 (8th Cir.1984). But, evidence that an employer has failed to live up to an affirmative action plan is relevant to the question of discriminatory intent. *Craik* at 472.

During the period about which plaintiff is complaining, NEANG had been undergoing some major adjustments in its management, and the main focus of the recruiting program was not on increasing minorities until 1981. Col. Bertrand testified that when he first arrived in Nebraska in 1976, NEANG was in serious trouble, having failed several national inspections. He found hostility and lack of cooperation between sections and, as a result, declining strength in technical areas. His first priority was to restore teamwork in order to pass an impending inspection. The next priority was to begin a recruiting program to rebuild personnel strength in critical, technical areas. At this time, Sgt. Gant was the only recruiter and should have played a key role in the rebuilding process. However, a number of recruiters hired while plaintiff was responsible for the management of the recruiting office only stayed for short periods. Col. Bertrand had several counseling sessions with plaintiff, but eventually had to place another person in charge of the recruiting office. This individual held an E–7 rank which caused Sgt. Gant to send his complaint about the rank inversion to National Headquarters, claiming it was motivated by race discrimination. This complaint did cause Major Daniels to send a two-man team to check the situation. On the basis of their report, he expressed concern about the rank inversion, but did not consider it the result of any form of racial discrimination. The fact of the matter was, Sgt. Brooks was a better manager than the plaintiff and got along better with the rest of the staff. No recruiters have left since 1979 when Sgt. Brooks replaced plaintiff as supervisor.

Only after the manpower crisis was stabilized was an affirmative action plan actively pursued. A plan was received from the National Guard Bureau in October, 1981, and MGen. Binder immediately encouraged its implementation. Captain Ronald Martin, Chief of Social Actions, testified that the initial goal of the Affirmative Action Program was to have a minority population in NEANG at least equal to that of the general population within a 50-mile radius of state headquarters. This radius includes Lincoln and Omaha which have the highest population of blacks in Nebraska. Defendants' evidence showed that by 1983 the total population in this area based on the 1980 census was 96.7 percent white, 1.6 percent black, and 1.8 percent other racial minorities. The population of NEANG personnel was comprised of 96.3 percent white, 3.89 percent black, and 1.6 percent other. Figures for the composition of the officers showed 96.3 percent white and 2.94 percent black. This can be compared to a

1975 survey which showed no black officers and a total personnel population of 97.22 percent white, and 2.57 percent black. It is clear that the present population of NEANG reflects the population of the target area and represents a reasonable distribution of blacks among officers and enlisted personnel. The encouragement Lt. Col. Wade gave plaintiff, to focus his recruiting skills in the black areas of Omaha, also supports the defendants' positive approach to affirmative action. In addition, an organizational climate survey prepared by the Air Force Manpower and Personnel Center, Randolph AFB, Texas, was taken of NEANG personnel in 1981. The survey results showed that 40 percent of the black personnel compared to only 12 percent of the white, strongly agreed that the management and supervisors respected them as individuals. NEANG black personnel rated their overall job satisfaction at 20.6 (28 highest possible rating). This compares most favorably with a national Air Force average rating by blacks placing their job satisfaction at 17.63.

Plaintiff's reliance on the "Kelley Report" of 1981 to demonstrate a discriminatory atmosphere is similarly misplaced. Major Kelley's figures were based upon the 1970 census and he was unaware of the black officers presently serving. Even so, Major Kelley found the racial atmosphere of NEANG had improved between 1979 and 1981. He did not find any discrimination directed toward plaintiff personally.

Plaintiff further tried to demonstrate an invidiously discriminating atmosphere by presenting evidence of racial slurs and derogatory comments. He was able to point to only three incidents which occurred at widely spaced intervals and involved three different individuals. In only one of these situations was the comment directed at the plaintiff personally. In that instance, the term "jokers" or "clowns" was used and included plaintiff and another individual. The term, while not respectful, is not an obvious racial slur and was used by the speaker in a casual, teasing manner. Neither of the two clearly racially derogatory comments were uttered in the presence of

the plaintiff. In both of these instances, the officers who made the comments issued public apologies.

■ While it is clearly possible for derogatory comments to be so pervasive and opprobrious or threatening as to constitute an unlawful employment practice, *Taylor v. Jones,* 653 F.2d 1193 (8th Cir.1981), it is also apparent that the level of racially oriented comments in the present situation was neither pervasive nor so derogatory as to rise to the level necessary to constitute a violation of plaintiff's right to a non-discriminatory work environment. *See: Cariddi v. Kansas City Chiefs Football Club,* 568 F.2d 87, 88 (8th Cir.1977); *Bundy v. Jackson,* 641 F.2d 934, 944 (DC Cir.1981).

Nor are plaintiff's complaints of personally directed discriminatory actions any stronger. SMS Gant's efforts to obtain an officer's commission in 1974 were encouraged and supported by the NEANG command. The commission was denied at the national level and based on information not known to the defendants. Even assuming his discrimination complaint was valid at the time, the incident is too old to be used to support plaintiff's present case. *Nebr. Rev.Stat.* 25–219 (Reissue 1979), places a three-year statute of limitations on actions brought under federal statutes which do not specify a time limit. *See: Chambers v. Omaha Public School Dist.,* 536 F.2d 222 (8th Cir.1976).

■ Plaintiff alleges that TAG–NE Supp. 1 (1982) was promulgated by MGen. Binder for the sole discriminatory purpose of removing plaintiff from his position as lead recruiter from NEANG.

The retention process is based on regulations and policy set down by the Department of the United States Air Force through its National Guard Bureau. Each state guard unit is allocated a specific size of membership and specific ranks to be filled. A low-ranking member, despite the quality of his performance, cannot advance if the upper ranks are already filled. In order to maintain force vitality, the National Guard Bureau established a policy of

reviewing enlisted personnel for retention after they have completed a specific number of years of service.

Defendants maintain that NEANG is now 100 percent staffed. Many of these individuals are long term personnel, and, in order to promote younger, competent individuals, these long term people must be removed by attrition. TAG–NE Supp. 1 was issued to increase upward mobility by decreasing the number of years of service required before mandatory review. The regulation itself provides for this contingency. ANG Reg. 39–06(2)(b). In addition, the regulation provides that it "in no way restricts the authority of unit commanders to deny reenlistment or extension of enlistment." ANG Reg. 39–06(1).

MGen. Binder testified that he felt it was necessary to lower from 28 to 26 the years of satisfactory service required before review of chief master sergeants and senior master sergeants in order to encourage the retention and promotion of capable, younger individuals. TAG–NE Supp. 1 was issued for the purpose of maintaining the vitality and high skill level of NEANG which had been rebuilt since 1976. As in all situations of this kind, there is always someone going to be caught by a policy change. Plaintiff happened to be one such person.

However, plaintiff has advanced no evidence to rebut defendants' argument that this regulation change was anything other than a legitimate move on the part of NEANG command to continue their efforts to upgrade the quality of the Nebraska National Guard. This "up and out" principle has been upheld numerous times as one of those functions necessary for senior officers to exercise in the proper management of their commands. *See: Tennessee v. Dunlap,* 426 U.S. 312, 96 S.Ct. 2099, 48 L.Ed.2d 660 (1975); *Pauls v. Sec. of Air Force,* 457 F.2d 294 (1st Cir.1972); *Turner v. Egan,* 358 F.Supp. 560, 564 (D.Ala.1973) aff. 414 U.S. 1105, 94 S.Ct. 831, 38 L.Ed.2d 733 (1973); *NeSmith v. Fulton,* 443 F.Supp. 411 (MD GA 1978) aff. 615 F.2d 196 (5th Cir.1980); *Lane v. Sec. of Army,*

504 F.Supp. 39 (DCMD 1980) aff. w/o opinion 639 F.2d 780 (4th Cir.1980); *Graham v. 3 or More Members of the 6 Member Army Reserve Gen. Officer Selection Bd.* 556 F.Supp. 669 (SD Tex.1983).

The next issue is Gant's claim that he was denied due process by the retention boards. Specifically, plaintiff claims that the retention process was constitutionally infirm in that he was not provided with reasons for his non-retention or separation from the NEANG. Plaintiff goes on to state that his efforts to appeal the decisions of the Selective Retention Board, as affirmed by the Appeals Board and MGen. Binder, were frustrated by this failure of the defendant to specify a reason for his non-retention. Thus, plaintiff concludes he was denied a fair appeal hearing since he was unable to counter the recommendation to not retain him due to lack of appropriate information.

Gant possesses no interest protected by due process in the continuation of his job with NEANG. "[N]ational Guard officers and enlisted men do not have an interest protected by the due process clause." *MacFarlane v. Grasso,* 696 F.2d 217, 222 (2nd Cir.1982). Procedural due process requirements apply only where there has been a deprivation of a liberty or property interest protected by the Fourteenth Amendment. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). In order for an individual to have a property interest in a government position, he must have more than a unilateral expectation; he must have a legitimate claim of entitlement to it. *Id.* at 577, 92 S.Ct. at 2709. An entitlement arises from a specific source, the terms of the contract, a statute or regulation governing the position sought, well established procedures, etc. The applicable ANG regulations are definite in rejecting such a claim: "Nothing in this regulation ... in any way restricts the authority of unit commanders to deny reenlistment or extension of enlistment." ANG Reg. 39–06(1). Gant has no property right in continued military employment. *See: Sims v. Fox,* 505 F.2d 857, 861–862 (5th

Cir.1974), *cert. denied* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 678 (1975); *MacFarlane* at 222; *Walker v. Alexander,* 569 F.2d 291, 293–294 (5th Cir.1978); *Lane* at 42.

 Furthermore, it is well established that there is no right to enlist in this country's armed forces. *West v. Brown,* 558 F.2d 757 (5th Cir.1977), *cert. denied,* 435 U.S. 926, 98 S.Ct. 1493, 55 L.Ed.2d 520 (1978); *Lindenau v. Alexander,* 663 F.2d 68, 72 (10th Cir.1981); *Nieszner v. Mark,* 684 F.2d 562 (8th Cir.1982), *cert. denied,* 460 U.S. 1022, 103 S.Ct. 1273, 75 L.Ed.2d 494, sub. nom. *Nieszner v. Orr.* This principle also applies to reenlistment. The fact that a soldier might be able to reenlist does not, by itself, create a protected expectation or entitlement. "Decisions to reenlist more properly fall within the categories of 'at will' decisions as opposed to terminations 'for cause'." *Williams v. United States,* 541 F.Supp. 1187, 1192 (ED NC, 1982), and, in fact, ANG Reg 39–06(2)(b) specifically states that separations under this regulation "will be identified as 'other than for cause'." As such, considering that no due process interest is triggered, military decisions not to reenlist a soldier are considered beyond the scope of judicial review. *NeSmith,* 443 F.Supp. at 413.

"[T]he forced retirement after 27 years of service under honorable conditions is a situation easily distinguished from outright discharge before 20 years of service have been accrued or in cases where the discharge is less than honorable. Had either of these two variables been involved, plaintiff's case for review might well have had greater convincing force." *Turner* at 563.

As with the plaintiff in *Turner,* Sgt. Gant was accorded all the due process to which he was entitled. Gant's term of service was extended from January to April expressly to qualify him for full retirement benefits, and he was given an honorable discharge. Simple denial of reenlistment carries no stigma which might act to foreclose any future job opportunities or impair his status in the community.

The procedure followed by the Selective Retention Board is set out in ANG Reg 39–06. Persons to be reviewed may submit letters to the board "inviting attention to any matter of record that they feel is important in the review of their record." ANG Reg. 39–06(6)(c)(1). Gant was so notified and he did respond. The Board had before it an abbreviated version of Gant's record and the recommendation of the Unit commander. There is no provision in these regulations that reasons be given to the reviewee as to how or why the Board arrived at its final recommendation.

Similar complaints were raised by plaintiffs in *Graham* at 669 and *O'Mara v. Zebrowski,* 447 F.2d 1085 (3rd Cir.1971). Graham had been denied a promotion and O'Mara had been ordered to active duty from his reserve status to satisfy a Ready Reserve Service obligation. In both situations, the courts found the applicable regulations adequately provided for due process where the reviewing boards satisfied the procedure set forth in the regulation. So too in the present case, the testimony demonstrates that both the Selective Retention Board and the Appeals Board met the requirements of ANG 39–06.

Therefore, it is apparent that Gant was not denied due process by the failure of the board to state explicit reasons for his non-retention. Furthermore, there was testimony revealing that the final authority for retention decisions is with the unit commander and that the purpose of the review by the Selective Retention Board is to ensure that guard members are not separated before their retirement interests vest.

As pointed out in *O'Mara:*

[T]he procedure of [the regulations] unquestionably could be improved. Determinations of a rather summary character which substantially affect individuals are, however, an every day occurrence in the military. It is not our function to decide what is best for enlisted reservists .... Given the factual context in which this procedure operates, and the presumption of constitutionality that attaches to this statutorily authoriz-

768

ed procedure, we are unable to conclude that the procedure is constitutionally defective.

*O'Mara* at 1090.

Plaintiff further claims that his right to due process was also violated because NEANG used the wrong regulation as a basis for his removal, if, in fact, the reason for his non-retention was actually due to his poor performance record. He notes that ANG Reg. 39–06(2)(b), states that "Any separations resulting from application of this regulation will be identified as 'other than for cause.'" He argues that separations based upon poor performance cannot be achieved under this regulation and claims such separations must instead be sought under ANG Reg. 33–02 which provides a process to remove poor performing recruiters.

The Court concludes that Gant reads too much into ANG Reg. 39–06. The language he relies upon is simply meant to ensure that a stigma of non-performance or misbehavior is not attached to non-retention. The regulation is meant to protect the guard member but is not intended to limit the type of situation in which a guard member may be denied reenlistment. ANG Reg. 33–02, on the other hand, is a more drastic method meant to allow the removal of a non-performing guard member before s/he has completed his/her term of enlistment. ANG Reg. 33–02 termination carries a stigma. Therefore, such terminations require the application of the normal rules of due process. *See: Rucker* at 941; *Neal v. Secretary of Navy,* 639 F.2d 1029 (3rd Cir.1981).

In his fourth claim, Gant argues that the supplement, TAG–NE Supplement 1, which amended ANG Reg. 39–06 by lowering the years of service required before a senior master sergeant can be reviewed by the retention board, is void for vagueness. The Court finds no merit in this contention. As mentioned above, ANG Reg. 39–06 gives adjutant generals the authority to "adjust downward the number of years of satisfactory service to accommodate their individual State's personnel plan." The

amendment of January 15, 1982, is perfectly clear and within MGen. Binder's authority.

After hearing all the evidence in this case and reviewing the applicable law, the Court finds that plaintiff, Wallace Gant, Jr., has advanced no compelling proof that he was discriminated against on the basis of his race, nor was he denied any due process by the procedure utilized to deny his request for reenlistment in the Nebraska Army-Air National Guard.

Plaintiff's request for a permanent injunction is denied.