**PROFESSIONAL HELICOPTER PI-LOTS ASSOCIATION, a labor organization, Plaintiff,**

**Local Union 2003, International Association of Machinists and Aerospace Workers, AFL–CIO, Plaintiff/Intervenor,**

v.

**Frank CARLUCCI, etc., et al., Defendants.**

**Civ.A. No. 88–D–1192–S.**

United States District Court, M.D. Alabama, S.D.

March 2, 1990.

---

George C. Longshore and Frederick T. Kuykendall, III and Franklin G. Shuler, Jr., Cooper, Mitch, Crawford, Kuykendall & Whatley, Birmingham, Ala., for plaintiff and plaintiff/intervenor.

James E. Wilson, U.S. Atty., and Kenneth E. Vines, Asst. U.S. Atty., Montgomery, Ala., for defendants.

## MEMORANDUM OPINION

DUBINA, District Judge.

There are pending in this cause defendants' motions to dismiss or in the alternative for summary judgment. Numerous arguments, briefs, and memoranda have been presented by all parties. On October 29, 1989, the court held a hearing on the pending motions and heard oral arguments. On October 30, 1989, the defendants resubmitted their motions for summary judgment. Numerous subsequent responses were filed by the plaintiff, Professional

Helicopter Pilots Association; the plaintiff-intervenor, International Association of Machinists and Aerospace Workers; and the defendants. After considering all available evidence, this court indicated to the parties on January 10, 1990, that it intended to grant the defendants' motions for summary judgment and that a memorandum opinion and order to that effect would be forthcoming in the near future.

## I. FACTS

Plaintiff, Professional Helicopter Pilots Association (hereinafter "PHPA"), is a labor organization representing civilian flight instructors employed by an independent contractor, Burnside–Ott Aviation Training Center, Inc. This company holds the Department of the Army ("DOA") contract with the United States Army to provide flight instruction to students at Fort Rucker Army Base in Alabama. The plaintiff-intervenor, Local Union 2003 of the International Association of Machinists and Aerospace Workers (hereinafter "IAM"), is the certified bargaining representative of another group of civilian employees. These employees are under contract with Dynacorp, and likewise work at Fort Rucker pursuant to Dynacorp's contract with the Army.

Both PHPA and IAM are parties to a collective bargaining agreement. This agreement requires as a condition of continued employment that all personnel will ensure timely accomplishment of the required annual flight (Army Class II) physical.[1] The regulations further provide that "coronary artery disease, as shown by any clinical or angiographic evidence is disqualifying for all classes of flight physicals."[2] In the past, the routine Class II Army physicals have not included testing for coronary artery disease (hereinafter "CAD").

On January 15, 1988, Colonel Bruce Chase (hereinafter "Chase"), Commander of the Army Aeromedical Center at Fort Rucker, Alabama, issued Aeromedical Policy Letter 28–88 which mandated CAD test-

1. Article XVII, § 17.2, Article XVII § 17.6 of the agreement.

2. AR 501, 4–16.

ing for all aircrew members, including the members of the PHPA and IAM. The policy provides for the identification of those aircrew members who have modifiable CAD risk factors. The identification process was developed so that the flight surgeon can intervene with the intent of preventing the development of CAD.[3]

The medical screening procedures are conducted in a phased manner progressing to four different potential levels.[4] The screening is based on a risk index of five percent which, if met or exceeded, requires the pilots to undergo a graded exercise test (hereinafter "GXT"). If the exercise test proves positive, the pilot is required to undergo further screening which includes a thallium scan, echocardiogram, and 24–hour halter monitor.[5] In the final stages of testing, the policy provides that a heart catheterization may be necessary for a full diagnostic evaluation.[6] (APL 28–88). The medical screening requirements to detect CAD are more stringent than those required by the Federal Aviation Administration ("FAA"). This, in part, is due to the difference in piloting Army helicopters as opposed to civilian, fixed-wing aircraft.[7]

Before establishing the CAD testing policy, the military conducted almost two decades of research. The published policy reflects the consensus of over a dozen aerospace medical specialists.[8] After much review these specialists became aware that

---

3. Affidavit of Colonel N. Bruce Chase at page 2.

4. Level 1 or primary screening includes a history (to include smoking history), physical evaluation, blood pressure and tests, measurements for cholesterol, height, weight, and blood sugar, and a resting electrocardiogram. These results are used to calculate the risk of CAD utilizing the nationally recognized Framingham risk index (which also considers the Merrell Dow risk index calculator). This index measures the chance of an individual's showing the signs of CAD within a period of time. For example, a "10" on the Framingham Index means that ten percent of the people with this index number will show a first symptom of CAD within six years of the calculation. The first symptom may be anything from the pain of angina to sudden death.

Level 2: If the risk index is greater than five percent, a secondary screen is required. The secondary level screening involves an exercise treadmill test ("GXT") and fluoroscopic x-ray of the heart conducted by a physician specialist under medically controlled conditions. In asymptomatic patients, as these pilots, the risk of complication is extremely rare. If either of these tests are abnormal, the aircrew member is disqualified from flying duties and requires further evaluation if that person requests waiver.

5. Level 3: When a "grounded" pilot requests an evaluation to determine whether he is eligible for a waiver, a noninvasive diagnostic workup is ordered to determine if there is any underlying cardiovascular disease. These tests, a 24–hour heart rhythm monitoring and an echocardiogram, help determine if the pilot is a candidate for cardiac catheterization or arteriography.

6. Level 4: If the pilot continues to seek evaluation to obtain a waiver, invasive diagnosis or cardiac catheterization is considered. Cardiac catheterization is the only test that can define the anatomy of the coronary arteries and direct-

ly measure the heart pump function quantitatively. The American Heart Association and American College of Cardiologists have stated that an acceptable primary indication for cardiac catheterization is an asymptomatic person with an abnormal GXT or calcification of the coronary arteries who is in a public safety occupation, such as aircrew member.

Cardiac catheterization is a safe procedure when performed in asymptomatic pilots. In over twenty years experience with Army and Air Force pilots since 1968, there have been no deaths and only rare complications which were correctable at the time they were identified. If catheterization reveals only minimal CAD, disqualification is waiverable. Significant CAD (significant coronary artery narrowing) is not waiverable.

The catheterizations are not done at Ft. Rucker, but rather are performed at military hospitals which have cardiologists who can perform these procedures. Active duty and retired military pilots can use the military medical facilities. Those pilots who are not retired military or who do not have military privileges seek catheterization at civilian hospitals.

7. Helicopters are aerodynamically less stable and, therefore, more hazardous to operate than standard fixed wing commercial aircraft. Army helicopters operate on lower flight paths which increase the risk of collision with objects on the ground. In addition, the flight maneuvers performed during training, simulating combat conditions, require more rapid and complex movements. Moreover, during flight training at Fort Rucker, there is only one certified pilot (the instructor) who is qualified to handle the controls. There is no co-pilot during flight training. Also, military helicopters have no autopilot capability that could be used during medical emergencies.

8. *See* Chase affidavit at page 3.

many of their aircrew personnel were at risk for CAD. After weighing the costs, benefits, and risks in support of and in opposition to the policy, the military determined that the decision weighed in favor of the CAD program.[9] Colonel Chase testified that the decision to implement this program was based upon studies which have been conducted for almost twenty years.

Conclusions and lessons learned from these studies have been gradually published in the later 1970's and into the 1980's. The Framingham Study is the most widely accepted and most popularly cited. Aerospace medicine specialists in all three services have been concerned about the prevalence, the number of individuals with disease at any given point in time, as asymptomatic coronary artery disease, which has been established to be between 3–5% of all crewmembers. The leading cause of medical suspension from the aviation duties in military pilots is coronary artery disease; therefore, by the early 1980's military aerospace medicine specialists were weighing the costs/benefits/risks of an aviation accident due to loss of expensive aircraft and

human life or livelihood versus the costs/benefits/risks of carrying out a coronary artery disease detection program.... [I]n 50% of the cases, the first symptom of coronary artery disease is acute incapacitation and even sudden death. The policy evolved that it was worthwhile to pursue the detection of coronary artery disease in aircrewmembers. A bonus or benefit of the detection program would also be to identify those aircrewmembers with elevated coronary artery disease risk factors and apply preventive measures in an attempt to prevent the development of coronary artery disease.... These principles are equally applied to military and civilian aircrewmembers who are instructors that train students since their inflight missions are identical. There have been several cases of civilian airline pilots who have died inflight due to coronary artery disease. The civilian instructor is presumed to have asymptomatic coronary artery disease as often as military aircrewmembers.[10]

The authority for the CAD program is found in Army Regulation 40–501.[11] AR

9. The reason for this decision was explained by Colonel N. Bruce Chase in his affidavit.

Since the 1970's, a great deal of prospective (following healthy patients) epidemiological research was done on large groups sufficient in size to draw reasonably valid statistical conclusions. Studies that prospectively wait for the development of disease take many years, even decades to conduct. The U.S. Air Force Aeromedical Consult Service, Brooks Air Force Base, Texas, began similar studies on pilots as a unique population that cannot be directly compared to the average civilian population....
The U.S. Air Force completed a 20–year study on thousands of aviators in the early to mid 1980's. This study demonstrated that for aviators, advancing age and elevated cholesterol were two of the most significant factors in estimating the aviator's risk for developing asymptomatic coronary artery disease. They developed an equation, the USAFSAM risk index, which was a modification of the Framingham Equation used by the U.S. Army. Since the Air Force is currently validating this equation by further study which should be completed by the early 1990's, the Army aerospace medicine specialists decided to design their coronary artery disease detection program with features similar to the Army Over-

40 Program. The Army Over–40 program assesses an average Army soldier's risk for future coronary artery disease....
*See* Chase affidavit at pages 3–5.

10. *See* Chase affidavit at pages 4–5.

11. Army Regulation 40–501, Standards of Medical Fitness, provides the following authorization for the Army to promulgate CAD testing procedures for civilian pilots:
4–1 b. This chapter gives medical conditions and physical defects which are causes for rejection for selection, training and retention of—
　　*　　*　　*　　*　　*　　*
(3) Department of the Army and contract civilian pilots.
4–15. Heart and vascular system
The causes of medical unfitness for flying duty classes 1, 1A, 2, and 3 are the following:
　　*　　*　　*　　*　　*　　*
1. Coronary artery disease, as shown by any clinical or angiographic evidence of coronary artery disease is disqualifying for all classes of flight physicals.
8–24. Flying duty medical examinations.
　i. (3) Administrative waivers....
The Cdr, USAAMC, in fulfilling his or her review and waiver responsibilities, is autho-

40–501 governs the standards for Medical Fitness for all persons subject to U.S. Army physicals.

"One of the causes of medical unfitness for flying duty Class 2 is coronary artery disease.... The regulation states in part 'Coronary artery disease as shown by any clinical or angiographic evidence of coronary artery disease, is disqualifying for all classes of flight physicals'.... AR 40–501, also authorized the commander of the Aeromedical Center to publish Aeromedical Policy Letters which amplify the requirements for examination contained in AR 40–501, as pertains to aviation personnel. So this letter, along with many other policy letters, was published under that authority." [12]

Although several issues are presented in this case, the dispositive question first to be considered is whether, in light of the PHPA's constitutional challenges, the regulations at issue are reviewable by this court. In the alternative, the court questions whether the PHPA and IAM may maintain suit against military officers when the law generally grants immunity to officers who, acting pursuant to military authority, create such policies.

For reasons hereinafter stated, it is clear that the military regulations at issue are not reviewable. In the opinion of this court, the policy is not arbitrary and capricious and is founded upon a rational, thoroughly researched basis. Applying the test set forth in *Mindes v. Seamen*, 453 F.2d 197 (5th Cir.1971),[13] this court is without the authority to second-guess the military policy. Moreover, even if the plaintiffs' claims could be reviewed, the defendants are entitled to immunity from all damages, and such immunity also extends to any injunctive relief. Because this matter can be resolved purely as a question of law and no genuine issues of material fact

exist, this matter may be appropriately resolved on summary judgment.

## II. THE STANDARD FOR GRANTING SUMMARY JUDGMENT

Rule 56(c), *Fed.R.Civ.P.*, provides that a summary judgment may be granted only: if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Accordingly, when considering a motion for summary judgment, the court must refrain from deciding any material factual issues. Instead, the court's sole function on a motion for summary judgment is to determine whether there exist issues of material fact to be tried and, if not, whether the moving party is entitled to a judgment as a matter of law. *See Dominick v. Dixie Nat'l Life Ins. Co.*, 809 F.2d 1559 (11th Cir.1987); *Tippens v. Celotex Corp.*, 805 F.2d 949 (11th Cir.1986); *Keiser v. Coliseum Properties, Inc.*, 614 F.2d 406 (5th Cir.1980). Moreover, in performing this function, inferences which are drawn from the underlying facts must be viewed in the light most favorable to the party opposing summary judgment. In other words, all doubt as to the existence of a genuine issue of material fact must be resolved against the party moving for summary judgment. *See United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Tippens*, 805 F.2d at 954; *Carlin Communication, Inc. v. Southern Bell Tel. & Tel. Co.*, 802 F.2d 1352 (11th Cir.1986).

As to the burden of proof on a motion for summary judgment, the movant clearly bears the exacting burden of showing both that there is no actual dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law.

---

rized to issue such policy letters as may be required to provide guidance to examiners in regard to examinations and procedures necessary to determine fitness for flying duty. [In this instance, the Cdr, USAAMC is Colonel Chase.]

**12.** *See* Chase affidavit at page 6.

**13.** In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent the decisions of the former Fifth Circuit issued before October 1, 1981.

*See Combs v. King,* 764 F.2d 818 (11th Cir.1985). In clarifying the proper allocation of this burden, the United States Supreme Court recently stated as follows:

[W]e are convinced that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict—"whether there is [evidence] upon which a jury [could] properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed."

\*      \*      \*      \*      \*      \*

Thus, in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden.... The question ... is whether a jury could reasonably find *either* that the plaintiff proved his case by the quality and quantity of evidence required by the governing law *or* that he did not.

\*      \*      \*      \*      \*      \*

Our holding, [however,] ... does not denigrate the role of the jury. It by no means authorizes trial on affidavits. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 254–55, 106 S.Ct. 2505, 2512, 2513–14, 91 L.Ed.2d 202 (1986) (citations omitted). *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## III. DISCUSSION

### A. REVIEWABILITY

■ The primary question this court must consider is whether the regulations in the instant case are reviewable by the district court. Generally, district courts have been guided by the clear pronouncement in *Orloff v. Willoughby,* 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1954), wherein the Supreme Court cautioned that "[j]udges are not in the business of running the Army.... Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to interfere in judicial matters." 345 U.S. at 93–94, 73 S.Ct. at 540.

Numerous courts have considered the reviewability of military regulations. The United States District Court for the Northern District of Alabama held in a similar instance:

The ability of this court to review managerial decisions involving military matters and national defense has been properly circumscribed.... *Orloff v. Willoughby,* 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1954).... Judicial intrusion in the procurement process has also been narrowly prescribed. Responsible executive officials must be given broad discretion in procuring supplies and services for the Government. Constant judicial intervention to review the merits of a particular procurement decision would

unduly burden the managerial effectiveness of the executive branch.

*American Fed'n of Gov't Employees v. Hoffmann,* 427 F.Supp. 1048, 1079 (N.D. Ala.1976). *See also, Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983); *Chilcott v. Orr,* 747 F.2d 29 (1st Cir.1984); *Blevins v. Orr,* 721 F.2d 1419 (D.C.Cir.1983); *Mindes v. Seaman,* 453 F.2d 197 (5th Cir.1971); *Allen v. United States,* 571 F.2d 14, 215 Ct.Cl. 524 (1978).[14]

Although district courts are cautioned not to review military regulations and decisions, this court recognizes that the doctrine of nonreviewability of military decisions is not absolute. Courts have expressed an increased, albeit limited, willingness to review military actions which are alleged to contravene express constitutional requirements. *Blevins,* 721 F.2d at 1421.[15]

In 1971 the Fifth Circuit Court of Appeals established in *Mindes* a two-part analysis by which the courts may determine whether a particular claim is reviewable.[16] First, the plaintiff must allege the deprivation of a constitutional right. *Stinson v. Hornsby,* 821 F.2d 1537 (11th Cir. 1987); *American Fed'n of Gov't Employees v. Hoffmann,* 427 F.Supp. at 1080.[17] Second, the court in *Mindes* requires that:

A district court faced with a sufficient allegation must examine the substance of that allegation in light of the policy reasons behind nonreview of military matters. In making that examination, such of the following factors as are present must be weighed (although not necessarily in the order listed).

1. The nature and strength of the plaintiff's challenge to the military determination.[18]

\*　　\*　　\*　　\*　　\*　　\*

**14.** The court in *Mindes v. Seaman* stated:
Traditional judicial trepidation over interfering with the military establishment has been strongly manifested in an unwillingness to second-guess judgments requiring military expertise and in a reluctance to substitute court orders for discretionary military decisions. Concern has also been voiced that the courts would be inundated with servicemen's complaints should the doors of reviewability be opened. But the greatest reluctance to accord judicial review has stemmed from the proper concern that such review might stultify the military in the performance of its vital mission.
453 F.2d at 199.

**15.** The court in *Mindes* further stated: "On the other hand, the courts have not entirely refrained from granting review and sometimes subsequent relief." 453 F.2d at 199.

**16.** Specifically, *Mindes* set forth the limited categories in which a court may consider review of military matters.
[T]he federal courts may review matters of internal military affairs to determine if an official has acted outside the scope of his powers.
\*　　\*　　\*　　\*　　\*　　\*
In numerous cases the courts of appeal have held that review is available where military officials have violated their own regulations.... (Citations omitted.)
Judicial review has been held to extend to the constitutionality of military statutes, executive orders and regulations.... (Citations omitted.) Recently this circuit had the opportunity to review the constitutionality of a regula-

tion promulgated by the commander of a military installation. *United States v. Flower,* 452 F.2d 80 (5th Cir.1971).
We do not infer that the commander has unfettered discretion under this regulation. We hold only that within certain limits, the military establishment has authority to restrict the distribution of printed materials. This right to restrict distribution must be kept within reasonable bounds and courts may determine whether there is a reasonable basis for the restriction.... [452 F.2d] [a]t 86.
*Mindes,* 453 F.2d at 199. *See also, Stinson v. Hornsby,* 821 F.2d 1537 (11th Cir.1987).

**17.** In *American Fed'n of Gov't Employees v. Hoffman,* 427 F.Supp. 1048 (N.D.Ala.1976), the court clearly stated:
As a predicate for review of internal military affairs, the Court held plaintiffs must allege the deprivation of a constitutional right or military action in violation of its own regulations.
427 F.Supp. at 1080.

**18.** The *Mindes* court explained this element further:
Constitutional claims, normally more important than those having only a statutory or regulatory base, are themselves unequal in the whole scale of values—compare haircut regulation questions to those arising in court-martial situations which raise issues of personal liberty. An obviously tenuous claim of any sort must be weighted in favor of declining review.
453 F.2d at 201.

2. The potential injury to the plaintiff if review is refused.

3. The type and degree of anticipated interference with the military function.[19]

\* \* \* \* \* \*

4. The extent to which the exercise of military expertise or discretion is involved. Courts should defer to the superior knowledge and experience of professionals in matters such as promotions or orders directly related to specific military functions.

453 F.2d at 201–202.

The law does not support the plaintiffs' contention that they have been deprived of any constitutional interest.[20] *American Fed'n of Gov't Employees v. Hoffmann* is very similar to the present case. In *Hoffman*, civilians challenged the constitutionality of Army regulations. The plaintiffs claimed they had a constitutionally protected property interest in employment during the life of their contracts with the Government. The court, however, found that the plaintiffs' constitutional claim for deprivation of property without due process of law was unsupported. *See also, Harper v. Jones*, 195 F.2d 705 (10th Cir.1952). The plaintiffs in the present case are in essence claiming the same property interest. However, in *Hoffmann,* Judge Guin adamantly stated: "None of the statutes or regulations on which they [the plaintiffs] rely entitle a civil servant to remain on the Government's payrolls during the life of contracts which violate regulations." 427 F.Supp. at 1081. The court additionally found the plaintiffs' regulatory claims to be unreviewable.[21] The court similarly reasoned:

> Even assuming plaintiffs can overcome the threshold determination, analysis of the *Mindes* standards precludes review. . . .
>
> \* \* \* \* \* \*
>
> Consideration of how best to perform the military mission is left to the discretion of military experts. . . . The military expertise involved in the decision to perform by contract in this case is considerable. . . . This court is in no position to superimpose its judgment for the Army decisions challenged by the plaintiffs. . . .
>
> \* \* \* \* \* \*

Plaintiffs cited numerous cases indicating expansive judicial review of military activities. . . . All these cases dealt with military personnel alleging arbitrary or capricious treatment under regulations promulgated and issued for their benefit. However, those same cases recognize that not every alleged violation of a military regulation gives a serviceman, much less a civil servant, a justifiable claim. . . . The decisions herein are committed to agency discretion by law; how-

---

**19.** This element was further defined by the *Mindes* court:

> Interference per se is insufficient since there will always be some interference when review is granted, but if the interference would be such as to seriously impede the military in the performance of vital duties, it militates strongly against relief.
>
> 453 F.2d at 201.

**20.** The plaintiffs claim that they have been deprived of a property interest in their employment. They align themselves with cases in which pilots have been deprived of their pilot's license without due process. But such is not the case here. Pilots are not being deprived of their licenses and therefore have not established that they been deprived of any "property interest." They are free to pursue other opportunities outside of Fort Rucker.

Moreover, the plaintiffs contend that they are being deprived of "life" without due process in that the CAD tests are more difficult on the patient than the disease itself. The court finds little merit in this contention. The facts reveal that although the contract to which they originally agreed requires fitness testing, the plaintiffs are not forced to undergo such testing. They have the opportunity to apply for waivers and choose to undergo testing for CAD or to refuse testing and elect to pursue other civilian employment.

**21.** The court in the *Hoffman* case dealt with civilian plaintiffs who alleged that to deprive them of employment through their contract would result in a deprivation of a property interest without due process of law. The court held as to this claim:

> Plaintiffs fail on this count. As explained above and below plaintiffs have no property interest in Federal employment during the existence of contracts which violate regulations, and the decisions and judgments to be made under the regulations are committed to agency discretion.
>
> 427 F.Supp. at 1080.

ever, even if they were not, the judicial review would be improper.

427 F.Supp. at 1080, 1082.

Next, applying the four-factor *Mindes* analysis, although the plaintiffs' interest in foregoing CAD testing is understandable, it is, nevertheless, not subject to review. In evaluating the nature of the claim, it is clear that the plaintiffs do not have a constitutional interest. While the record indicates that the tests can ultimately be very difficult for the patient, the record also indicates that the tests are medically necessary. Furthermore, the record reveals that testing is in the best interest of the patient as well as the Army. When the plaintiffs' interests are weighed against the rationale of the Army policy, case law establishes that the Army's interests are reasonable. As stated in *National Treasury Employees Union v. Von Raab*, — U.S. —, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989): "It is readily apparent that the Government has a compelling interest in ensuring that front line interdiction personnel are physically fit, and have unimpeachable integrity and judgment." *Id.* 109 S.Ct. at 1393. In the present case, the Army has a substantial interest in the lives of its students and the lives of others which may be destroyed as a result of an instructing pilot's lapse due to CAD, as well as in millions of dollars worth of property. Therefore, the nature of the plaintiffs' claims do not rise to a level which outweighs the substantial interest of the Army.

As to the second element of the *Mindes* analysis, if review is refused, a plaintiff is placed at no greater risk in undergoing the testing as he may be if the disease is left untreated. Lieutenant Colonel David J. Wehrly,[22] (hereinafter "Wehrly") a military surgeon, testified: "with regard to cardiac catheterization, the danger associated with it is directly proportional to the severity of the underlying cardiac disease in a given individual."[23] The testing, therefore, benefits the patient by identifying aircrew members with risk factors. Once those persons at risk are identified, medical personnel are able to apply appropriate measures to prevent CAD development and thus prolong the crewmembers' lives and careers.[24] Moreover, if review is refused, a plaintiff who exhibits signs of severe CAD may choose to undergo testing or select other employment in the civilian community.

On the other hand, if a change in policy was mandated by this court, such a ruling would result in a substantial interference with military function and expertise. It is clear that the policy in existence is one which has taken almost two decades to refine for the protection of instructors, students and property.

*American Fed'n of Gov't Employees v. Hoffmann* also involved military weapons, equipment, and civilian interests. In *Hoffmann,* the court stated:

In the matters such as the one before us in this case, where the procurement decision touches on weapons systems which may have a vital impact on national defense, the courts must be wary of intruding into areas where they have neither special competence nor the ability to act expeditiously.

427 F.Supp. at 1080 (quoting *Hayes Int'l Corp. v. McLucas*, 509 F.2d 247, 257 (5th Cir.1975), *cert. denied,* 423 U.S. 864, 96 S.Ct. 123, 46 L.Ed.2d 92 (1975)). Furthermore, in *Blevins v. Orr*, the court unequivocally held that "it is beyond the expertise, as well as the authority of the judiciary to second-guess the military with respect to overall manpower needs and promotion policies or to pass judgment on military policy concerns, ..." 721 F.2d at 1423.

---

**22.** Lieutenant Colonel David J. Wehrly is the Dean of the School of Aviation Medicine at Fort Rucker. He is very familiar with the policy and tests at issue as evidenced by the fact that after receiving his medical degree from Southwestern Medical School, he completed his residency in internal medicine at Brook Army Medical Center and in aerospace medicine at the School of Aerospace Medicine, Brooks Air Force Base, where many of the studies on which this policy is based have taken place. He has also obtained a masters degree in public health from Harvard University and he has been the Division Flight Surgeon for the 5th Infantry Mechanized, Delta Force and the Chief of Cardiopulmonary Research at the U.S. Army Aeromedical Research Lab.

**23.** *See* Wehrly affidavit at page 7.

**24.** *See* Chase affidavit at page 5.

The testimony which indicates that many pilots appear to be at risk for CAD, and that the first symptoms are usually sudden incapacitation and even death, further supports the reasonableness of the policy mandate.[25] Thus, CAD puts at risk the military flight students, millions of dollars worth of United States property and potentially many other lives.

Although dealing with Fourth Amendment search and seizure issues, the rationale in *National Fed'n of Federal Employees v. Cheney*, 884 F.2d 603 (D.C.Cir. 1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 864, 107 L.Ed.2d 948 (1990) is applicable to the case at hand. In *Cheney*, the court held:

> It is readily apparent that the Army has a compelling safety interest in ensuring that the approximately 2,800 civilians who fly and service its airplanes and helicopters are not impaired by drugs. Employees in each of the covered positions—air traffic controllers, pilots, aviation mechanics and aircraft attendants—perform tasks that are fraught with extraordinary peril: A single drug-related lapse by any covered employee could have irreversible and calamitous consequences.

*Id.*, at 610.

In *United States v. Edwards*, 498 F.2d 496 (2d Cir.1974), Judge Friendly reasoned:

> When the risk is the jeopardy to hundreds of human lives and millions of dollars of property inherent in the pirating or blowing up of a large airplane, the danger *alone* meets the test of reasonableness, so long as the search is conducted in good faith ... and with reasonable scope and the passenger has been given advance notice....

*Id.*, at 500 (emphasis in original).

After referring to the above passage in *Edwards*, the court in *National Fed'n of Federal Employees v. Cheney* further stated:

[I]n *Skinner* [*v. Railway Labor Executives' Association*, —— U.S. ——, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989)] the Court made clear that the reasonableness of a particular technique does not " 'necessarily or invariably turn' " on the existence of less intrusive alternatives. 109 S.Ct. 1419 n. 9 (quoting *Illinois v. Lafayette*, 462 U.S. 640, 647 [103 S.Ct. 2605, 2610, 77 L.Ed.2d 65] (1983)). Like appellees, respondents in *Skinner* maintained that the governments' interests could be adequately addressed by enforcing proscriptions already in force and by training supervisory personnel in drug impairment detection. The Court rejected this claim in part because "insistence on less drastic alternatives would require us to second-guess the reasonable conclusions drawn by the FRA after years of investigation and study." *Id.* The same analysis governs in the present case.

\*　\*　\*　\*　\*　\*

Moreover, the employees who are subject to testing in this category "can cause great human loss before any signs of impairment become noticeable to supervisors or others." *See Skinner*, 190 S.Ct. at 1419. While the Army, ... has not expressly considered the various alternatives ... it is, in light of its experience from fifteen years of testing its military personnel, better able than we to assess the efficacy of urinalysis testing.

884 F.2d at 610–11.

Furthermore, testing has been consistently authorized in military jobs which are classified as "critical."[26] Pilots and aircraft machinists have been specifically designated in this "critical" category. The Supreme Court has recognized the importance of the Government's need to discover such "latent or hidden conditions or to prevent their development" and has justified

25. *See* Wehrly affidavit at page 9.

26. *Cheney* lists the following specific "critical" job categories subject to drug testing: air traffic controller, pilot, aircraft engine mechanic, aircraft overhaul specialist, propeller and motor mechanic, aircraft mechanic, aircraft servicer, guard, police, criminal investigator, correctional officer, chemical and nuclear surety positions, direct service staff, and all employees at Army forensic drug testing laboratories. 884 F.2d at 606, n. 5.

**450**

such an invasion into an individual's privacy on those grounds. *National Treasury Employees Union v. Von Raab,* —— U.S. ——, 109 S.Ct. at 1392. In *Von Raab,* the court found:

> It is readily apparent that the Government has a compelling interest in ensuring that front-line interdiction personnel are physically fit....
>
> *       *       *       *       *       *
>
> We agree with the Government that the public should not bear the risk that employees who may suffer from impaired perception and judgment will be promoted to positions where they may need to employ deadly force.
>
> *       *       *       *       *       *
>
> [I]t is plain that certain forms of public employment may diminish privacy expectations even with respect to such personal searches.... Similarly, those who join our military or intelligence services may not only be required to give what in other contexts might be viewed as extraordinary assurances of trustworthiness and probity, but also may expect intrusive inquiries into their physical fitness for those special positions.
>
> *       *       *       *       *       *
>
> Because successful performance of their duties depends uniquely on their judgment and dexterity, these employees cannot reasonably expect to keep from the Service personnel information that bears directly on their fitness.... While reasonable tests designed to elicit this information doubtless infringe on some privacy expectations, we do not believe these expectations outweigh the Government's compelling interests in safety and in the integrity of our borders.
>
> *       *       *       *       *       *
>
> Where, as here, the possible harm against which the Government seeks to guard is substantial, the need to prevent its occurrence furnishes an ample justification for reasonable searches calculated to advance the Government's goal.

109 S.Ct. at 1392–95.

In conclusion, under the *Mindes* analysis, the plaintiffs' interest, although under-

standable, does not outweigh the compelling governmental interests in preserving numerous lives and millions of dollars worth of property. Therefore, this court must conclude that the plaintiffs' challenge is not reviewable.

**B. IMMUNITY**

Alternatively, the defendants are also entitled to summary judgment based upon the immunity extended to federal officials performing adjudicatory functions. *United States v. Stanley,* 483 U.S. 669, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987); *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1977); *Watson v. Arkansas Nat'l Guard,* 886 F.2d 1004 (8th Cir.1989); *Jaffee v. United States,* 663 F.2d 1226 (3rd Cir.1981), *cert. denied,* 456 U.S. 972, 102 S.Ct. 2234, 72 L.Ed.2d 845 (1981). Generally, the Supreme Court, in *Harlow v. Fitzgerald,* summarized the court's position on the immunity issue, stating:

> [O]ur decisions consistently have held that government officials are entitled to some form of immunity from suits for damages. As recognized at common law, public officers require this protection to shield them from undue interference with their duties and from potentially disabling threats of liability.

457 U.S. at 806, 102 S.Ct. at 2732. Moreover, immunity has been granted to military officers and has been justified on the grounds that a military officer must have a great deal of discretion in preserving and adhering to the priorities and regulations surrounding the "special nature of military life." As stated in *Watson v. Arkansas Nat'l Guard:*

> The Supreme Court has stated that "[t]he special nature of military life—the need for unhesitating and decisive action by military officers and equally disciplined responses by enlisted personnel—would be undermined by a judicially created remedy exposing officers to personal liability at the hands of those they are

charged to command." *Chappell [v. Wallace]*, 462 U.S. [296] at 304, 103 S.Ct. [2362] at 2367 [76 L.Ed.2d 586 (1983)]. This reasoning applies with equal force to the possibility of a judicially imposed injunctive remedy. "[C]enturies of experience have developed a hierarchical structure of discipline and obedience to command, unique in its application to the military establishment and wholly different from civilian patterns." *Id.* at 300, 103 S.Ct. at 2366.... The threat to the "special nature of military life" is present regardless of the remedy the soldier seeks.

886 F.2d at 1008.

■ When federal officials have adhered to the regulations within the scope of their employment, the court has often granted absolute immunity. *Butz v. Economou*, 438 U.S. at 508–17, 98 S.Ct. at 2911–16. However, when the federal official has performed a discretionary function, courts have granted that official qualified immunity. *Harlow v. Fitzgerald*, 457 U.S. at 818, 102 S.Ct. at 2738. Even when constitutional violations have been involved, federal officials performing discretionary functions have not been granted any less than qualified immunity. *Mitchell v. Forsyth*, 472 U.S. at 525–26, 105 S.Ct. at 2814–15.[27] In the instant case, the plaintiffs have sued each defendant both in their professional and individual capacities. Nevertheless, the law clearly holds "where the defendant-official is engaged in something which the law authorizes him to do, or, is acting pursuant to valid authority validly conferred, the suit will be held to be against the United States." *Ainsworth v. Barn Ballroom Co.*, 157 F.2d 97, 101 (4th Cir.1946). *See also Harper v. Jones*, 195 F.2d at 706. Therefore, when an official is acting pursuant to his or her authority, immunity applies.

The standard for qualified immunity was established in *Harlow v. Fitzgerald*. In *Harlow*, the Court held "that government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. at 818, 102 S.Ct. at 2738.[28]

This principle was clearly illustrated in the case of *Mitchell v. Forsyth*. In *Mitchell*, the Attorney General authorized a warrantless wiretap for the purpose of obtaining intelligence information that potentially threatened national security. The Supreme Court found that the Attorney General was not entitled to absolute immunity. However, the Court also held:

---

**27.** In *Jaffee v. United States*, 663 F.2d 1226 (3rd Cir.1981), *cert. denied*, 456 U.S. 972, 102 S.Ct. 2234, 72 L.Ed.2d 845 (1981) the court stated:

Although we recognized that "the current academic and judicial thought finds governmental immunity from suit in disfavor," we observed, on the basis of *Feres [v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950)], that the rationale for service immunity was different:

If claims for injuries sustained by members of the armed forces in the execution of military orders were subjected to the scrutiny of courts of justice, then the civil courts would be required to examine and pass upon the propriety of military decisions. The security and common defense of the country would quickly disintegrate under such meddling. "[A]ctions and essential military discipline would be impaired by subjecting the command to the public criticism and rebuke of any member of the armed forces who chose to bring suit against the United States."

663 F.2d at 1229 (citations omitted).

**28.** Furthermore, in *Jaffee,* the court reasoned: This fact provides one of the principal justifications for some form of immunity for individual government officials. As the Court stated in *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), immunity for government officials is based on two mutually dependent rationales:

(1) the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion; (2) the danger that the threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment required by the public good.

*Id.* at 497 [98 S.Ct. at 2906]....

Indeed, this court in *Bailey v. DeQuevedo* [375 F.2d 72 (3rd Cir.1967)], [citations omitted] found that the justifications for the immunity announced in *Feres* applied to suits brought against government officials in their individual capacity.

663 F.2d at 1234.

Under the standard of qualified immunity articulated in *Harlow v. Fitzgerald,* the Attorney General will be entitled to immunity so long as his actions do not violate "clearly established statutory or constitutional rights of which a reasonable person would have known."

\*    \*    \*    \*    \*    \*

Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery.

472 U.S. at 524, 526, 105 S.Ct. at 2814, 2815.[29]

■ Applied to the present case, the facts reveal that the challenged policy was issued in the official capacities of the defendants and pursuant to discretionary military authority. Moreover, the issuance of the policy did not violate any "clearly established statutory or constitutional right." As previously stated, the justification for the policy included years of research and a wealth of interests benefiting the pilots, students, civilians, and military property. As a result, this court does not find that there has been any abuse of that discretion. Under the law as it presently exists and coupled with the evidence submitted in this case, in the opinion of this court, the defendants are entitled to immunity from all monetary damages.

■ Likewise, although the immunity granted to such officials is usually extended only to monetary damages, the principle underlying such immunity has also been held to extend to injunctive relief. When injunctive relief if granted would be intrusive into the military structure and would require the court to second-guess military discretion, such relief has been held to be inappropriate. *Watson v. Arkansas Nat'l Guard,* 886 F.2d at 1008–09; *Crawford v. Texas Nat'l Guard,* 794 F.2d 1034, 1036 (5th Cir.1986); *Harper v. Jones,* 195 F.2d at 705–707; *Ainsworth v. Barn Ballroom Co.,* 157 F.2d at 101. As the court so carefully stated in *Watson v. Arkansas Nat'l Guard:*

> In *Chappell,* the Supreme Court made no direct reference to claims for injunctive relief against the military. However, the policies upon which the *Feres* doctrine, and subsequent case law in that doctrine's development, are premised weigh heavily in favor of precluding claims for equitable relief.

886 F.2d at 1008.

The court in *Watson* clearly explained the rationale behind this policy.

> Here the equitable relief sought by Watson would require a highly intrusive judicial inquiry into personnel decisions that bear upon the readiness of the military to perform its mission. Claims in civilian courts challenging personnel decisions of the military services have an undeniable potential for undermining military disciplines and thus for impairing training programs and operational readiness. We are not the first to note the inappropriateness of judicial intrusion into matters affecting military discipline, training, or readiness. *See, Gilligan v. Morgan* 413 U.S. 1, 7–8, 93 S.Ct. 2440, 2444, 37 L.Ed.2d 407 (1973).... Further, judicial inquiry into claims such as Watson's would thrust the courts into an area of responsibility extensively controlled by and constitutionally entrusted to the legislative and executive branches. Congress, acting pursuant to its constitutional authority, has established a comprehensive system to regulate military

---

**29.** The conception animating the qualified immunity doctrine as set forth in *Harlow v. Fitzgerald,* 457 U.S. 800 [, 102 S.Ct. 2727, 73 L.Ed.2d 396] (1982), is that "where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequences.'" *Id.,* at 819 [, 102 S.Ct. at 2739], quoting *Pierson v. Ray,* 386 U.S. 547, 554 [, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288] (1967). As the citation to *Pierson v. Ray,* makes clear, the "consequences" with which we were concerned in *Harlow* are not limited to liability for money damages; they also include "the general costs of subjecting officials to the risks of trial—distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service."

*Mitchell v. Forsyth,* 472 U.S. at 525–26, 105 S.Ct. at 2814–15.

life.... Based upon a searching consideration of the policies underlying *Feres* and *Chappell*, we are unable to conclude that military discipline will be any less affected by a suit for injunctive relief than by a claim for damages. The judiciary does not acquire competence in this area merely because the remedy sought is an injunction rather than damages. The military concerns found compelling in *Feres* and *Chappell* are equally present here.... We therefore believe that suits for injunctive relief, like those for monetary damages, must be carefully regulated in order to prevent intrusion of the courts into the military structure.

886 F.2d at 1008–09.

Specifically dealing with the issue of injunctive relief as applied to military regulations, the court in *Harper v. Jones* found:

The President is authorized to make and publish regulations for the government of the army which shall be enforced and obeyed until altered or revoked by the same authority. 10 U.S.C.A. § 16.... What is necessary for the discipline of military personnel and to safeguard their health and welfare is to be determined by the commanding officers and not the courts.

195 F.2d at 707. The court in *Harper* found that it was without the authority to enjoin a commanding military officer from enforcing a regulation created by that officer in the interest of the health and welfare of his troops.

Furthermore, federal courts have been strongly encouraged by the Supreme Court to defer to the professional judgment of the military in discretionary matters. As stated in *Rostker v. Goldberg*, 453 U.S. 57, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981), "... in the context of Congress' authority over national defense and military affairs, and perhaps in no other area has the Court accorded Congress greater deference." *Id.* at 63–64, 101 S.Ct. at 2650–51.

The Court, in the often cited *Gilligan v. Morgan*, 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973), stated:

Moreover, it is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches. The ultimate responsibility for these decisions is appropriately vested in branches of the government which are periodically subject to electoral accountability.

*Id.* at 10, 93 S.Ct. at 2446 (emphasis in original). *See also Chappell v. Wallace*, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983).

In the opinion of this court, to order injunctive relief in the present case would require this court to second-guess the professional judgments which have taken almost two decades to construct. This court is unwilling to take such action.

Accordingly, for all of the foregoing reasons, it is the opinion of this court that the defendants' motions for summary judgment are due to be GRANTED and the complaint in this cause dismissed with prejudice.

A separate order will be entered in accordance with this memorandum opinion.